[Civ. No. 18735.   Second Dist., Div. Three.   June 24, 1952.]

CALIFORNIA HORSE RACING BOARD, Appellant, v. LOS ANGELES TURF CLUB, INC. (a Corporation), Respondent.

Edmund G. Brown, Attorney General, James E. Sabine and Edward Sumner, Deputy Attorneys General, for Appellant.

Victor Ford Collins and Arnold M. Cannan for Respondent.

WOOD (Parker), J.—Action to recover license fees allegedly due in connection with licensing horse racing. Plaintiff appeals from a judgment for defendant.

Plaintiff, as the administrative agency charged with the

administration of the law relating to horse racing, issued a license to defendant to conduct a horse racing meeting at Santa Anita Park for 50 days beginning December 26, 1949, and ending March 4, 1950. Defendant conducted the racing at that place during said time.

This action involves the interpretation of section 19485.1 of the Business and Professions Code which relates to the deduction and disposition of breakage and the payment of license fee attributable to breakage. That section provides as follows: "Notwithstanding any other provision of this code, each licensee shall, as to any payment made to a person who has wagered by contributing to the pool, also deduct the odd cents by which the amount payable as to each dollar wagered by such person exceeds a multiple of five cents ($0.05), which are known as breakage. In such case the total amount of the moneys so deducted as breakage on the first twenty-seven million dollars ($27,000,000) or less of the gross amount of money handled in the pari-mutuel pool operated by him during the period of the license may be retained by the licensee; and the remainder shall be paid daily during each racing meeting by licensees to the board in addition to and as a part of the license fee required by Section 19485. The amount of the license fee attributable to the breakage shall be reported and paid as a separate item."

At all times after January 21, 1950, the gross amount handled by defendant during that racing meeting exceeded $27,000,000.

On February 25, 1950, the total wagers contributed to the place pool in the seventh race were $257,215. After deducting therefrom the 6 per cent license fee provided for plaintiff by section 19485 of said code and 7 per cent commission provided for defendant by section 19597 of said code, the sum of $223,777.05 remained for distribution to holders of place tickets in the seventh race. After that race was finished, it was ascertained that the holders of place tickets who were entitled to distributions from the place pool had contributed $229,945, or $6,167.95 more than was available for distribution.

On February 25, 1950, the total wagers contributed to the show pool in the seventh race were $423,080. After deducting therefrom the 6 per cent license fee provided for plaintiff and the 7 per cent commission provided for defendant, the sum of $368,079.60 remained for distribution to holders of show tickets in the seventh race. After that race was

finished, it was ascertained that the holders of show tickets who were entitled to distributions from the show pool had contributed $390,607, or $22,527.40 more than was available for distribution.

Although the amount available for distribution to holders of place and show tickets in the seventh race on February 25th was $28,695.35 ($6,167.95 and $22,527.40) less than the amount contributed to those pools by the ticket holders, defendant distributed to holders of the place and show tickets $1.05 for each $1.00 wagered by them, that is, defendant distributed to those ticket holders as a profit or bonus 5 per cent of the amount wagered by them. In other words, since the total amount wagered by those holders was $620,552 ($229,945 plus $390,607) the 5 per cent distributed to the holders, as a profit or bonus, amounted to $31,027.60. The total amount, therefore, which was distributed to the holders of place and show tickets in the seventh race exceeded the amount available for distribution by $59,722.95 ($28,695.35 and $31,027.60). (The total of $620,552, contributed by ticket holders, and the $31,027.60, paid as the 5 per cent profit or bonus, made a total of $651,579.60 to be paid. The total sum available for distribution was $591,856.65 [$223,-777.05 and $368,079.60]. Difference between $651,579.60 and $591,856.65 is $59,722.95.)

The odd cents, or breakage, deducted by defendant with respect to distribution from pools on said February 25th to persons who had contributed to pools in the first to sixth races, inclusive, and the eighth race, and to the win pool in the seventh race, amounted to $16,467.82. Defendant refused to pay this sum to plaintiff.

The amounts of breakage deducted by defendant from pools on subsequent days in that racing meeting, which amounts defendant refused to pay to plaintiff, were as follows: February 28th, $9,338.96; March 1st, $12,589.60; March 2d, $11,-585.60; March 3d, $15,724.12. The total of those amounts of breakage, which defendant refused to pay to plaintiff, is $65,706.10. Defendant has since paid to plaintiff the sum of $5,593.15, leaving a balance of $59,722.95. This balance, which defendant has retained from the breakage, is the exact amount by which the payments made to holders of place and show tickets in the seventh race on February 25th exceeded the amount available for distribution. In other words, the defendant retained from the breakage in the win pool of February 25th and all the pools on said subsequent

days the aggregate sum of $59,722.95, which was an amount sufficient to reimburse itself (1) for the $28,695.35 which it paid to satisfy the deficiencies in the place and show pools in the seventh race on February 25th, and (2) for the $31,-027.60 which it paid as a 5 per cent profit or bonus in that race.

The court found that although neither the law nor any rule of the racing board requires the same, when the amounts in the pools to be distributed to the holders of winning tickets are insufficient to pay the holders the full amount wagered plus a profit of five cents for each dollar wagered, it is a universal custom to pay the amount wagered plus a minimum profit for each dollar wagered; the amount of this minimum profit is a multiple as provided by law for determining the amount payable on winning tickets, which, in California, is five cents for each dollar wagered; said "last explained situated is what is known at race tracks as a minus pool"; breakage is the balance remaining in the pools after deducting the tax to the state and commission to the track, as provided by law, and the amounts actually paid to the winners; it is a universal custom where the pari-mutuel system is used that in computing breakage there shall first be taken into consideration the amounts of the minus pools paid by the track and deducting such minus pools from the amounts not paid to the winners for the race meeting before arriving at the amount of breakage to be paid to the state or retained by the racing association; on February 25, 1950, in the seventh race, after paying fees and commissions from the total amount wagered, there remained insufficient money to pay the winners any profit, or enough to refund to the winners the full amount wagered by each winner; the defendant, in reliance upon said custom, contributed to the amount to be repaid to the winners sufficient money which enabled them to pay the winners the amount wagered plus a profit of five cents on each dollar wagered; shortly after the enactment of said section 19485.1 it was agreed between plaintiff, acting through its secretary, and defendant, acting through its assistant secretary and controller, that the proper interpretation of said section was that in the event a minus pool was caused after $27,000,000 gross had been handled, then in computing the breakage to which the state would be entitled as an additional license fee there should first be deducted the amount of the minus pool; on February 25, 1950, in the seventh race there were minus pools aggregating the

sum of $59,722.95, and defendant contributed said sum to the amount available for distribution to the winners in order to pay them the amount wagered plus a profit of 5 per cent on each dollar; defendant paid said sum in reliance upon the agreement that such sum should be deducted from the gross breakage to which plaintiff was entitled, and by reason thereof plaintiff is estopped to deny the agreement in regard to the interpretation of said section 19485.1; defendant was entitled to withhold from the amounts collected as breakage on February 25th and 28th and on March 1st, 2d and 3d, which otherwise would have been payable to the plaintiff, the sum of $59,722.95, and by reason thereof nothing is due to plaintiff.

Appellant (racing board) contends that the breakage referred to in said section 19485.1 of the Business and Professions Code which is to be paid to the state as an additional license fee, after $27,000,000 has been handled, means the net breakage in each pool of each race on each day, after deducting the ordinary or fixed percentages allowed by statute —6 per cent for the state and 7 per cent for the track. It argues that the section is clear and unambiguous, and that the testimony introduced by respondent (track) regarding custom and usage was immaterial; that the action here pertains to a section indicating how odd cents should be treated and does not pertain to a section relating to breakage without a definition of that term.

Respondent contends that the breakage so referred to means the net breakage as a unit in all pools in all races in the entire racing meeting (after $27,000,000 has been handled), after deducting said fixed percentages and deducting any amounts the track has paid on any day during such entire racing period to satisfy minus pools—including the 5 per cent profit or bonus. It argues that the section is uncertain and ambiguous in that it merely uses the word "breakage" and does not specify whether breakage should be computed (1) as a unit on all pools in all races during the entire period, or (2) on all pools in all races on each day, or (3) on all pools in each race on each day, or (4) on each pool in each race on each day.

Prior to the enactment of said section 19485.1 in 1947, all breakage was retained by the licensee (track) as additional commission. Since that enactment, the breakage on the first $27,000,000 of the gross amount handled "may be retained by the licensee" and "the remainder *shall be paid daily*"

to the racing board "in addition to and as a part of the license fee." (Emphasis added.) Said section is the statutory authority for distribution by the licensee in multiples of five cents rather than in exact amounts. Under that section the licensee is directed to deduct, from amounts payable to contributors to the pool, the odd cents in excess of a multiple of five cents. Breakage is defined therein as the odd cents so deducted. The licensee is given permission, under the section, to retain the breakage on the first $27,-000,000 gross handled, but is directed to pay the remainder of the breakage daily to the racing board as a part of the license fee. ■ There is no reference therein to a "minus pool," and there is no provision therein that any offset may be made against the odd cents or breakage required to be paid to the board. There is no provision in that section or in the law which requires a licensee to add or contribute to the amount available for distribution in order to pay said minimum profit or bonus of five cents or any amount to the winners. The section is not ambiguous. It purports to deal only with the deduction of the odd cents and the distribution of them. It states clearly that a certain amount of the breakage may be retained by the licensee and that the remainder must be paid daily to the state or board as a part of the license fee. Any offset against the breakage that is due to the state would result in a failure to pay the required license fee for the privilege of conducting the racing meeting. Respondent argues that it was not intended that the track should be penalized by being required to make up the difference between plus breakage and minus breakage by paying such difference to the state out of its own pocket; and that such a construction of the section would be working a hardship and injustice upon the track. Requiring the licensee to pay the full license fee, if there should be a minus pool after $27,000,000 gross has been handled, would not be penalizing the licensee or working a hardship or injustice upon it. The full license fee consists of the fixed percentage allowed by statute (Bus. & Prof. Code, § 19485) and the breakage after the first $27,000,000 has been handled. If it were proper to offset a minus pool against the breakage due to the state (after $27,000,000 had been handled), it would seem that it would also be proper to offset a minus pool, occurring before $27,000,000 has been handled, against the fixed statutory percentage. Certainly it would not be contended that a minus pool should

be offset against the part of the license fee consisting of the fixed statutory percentage. In applying for and accepting the license which was issued, respondent agreed to comply with the orders, regulations, and laws relating to horse racing, including of course an agreement to pay the license fee. Respondent took its chances on not "winning" a minus pool. Respondent states in its brief that ordinarily there is plus breakage, but on rare occasions there is minus breakage or a minus pool. The matter of paying the profit or bonus of 5 per cent to the winners was a voluntary act on the part of the licensee. The licensee was not entitled, however, to make such a donation at the expense of the state. Such profit or bonus was not deductible from the breakage due to the state. The breakage referred to in said section 19485.1 means the net breakage on each pool of each race on each day after deducting the fixed percentages allowed by statute.

Since the said section 19485.1 is clear and unambiguous, the testimony as to usage and custom should not have been received.

The alleged agreement between the secretary of plaintiff (racing board) and the assistant secretary and controller of defendant (licensee), regarding the interpretation of said section 19485.1 in the event there should be a minus pool, did not constitute an estoppel against plaintiff. The trial judge said in part in ruling on the motion for a new trial that he believed that estoppel had in effect taken place with respect to the board, and that on looking at the equities in the situation it would be inequitable to force the track to pay the money. The secretary of the racing board did not have the power to bind the state by his declaration as to the interpretation of said section, and his authority as an agent of the state could not be expanded by estoppel. (See *Boren* v. *State Personnel Board*, 37 Cal.2d 634, 643 [234 P. 981].)

By reason of the above conclusions, it is not necessary to determine the other contentions of the parties.

The judgment is reversed. The purported appeal from the order denying the motion for a new trial is dismissed.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied July 9, 1952, and respondent's petition for a hearing by the Supreme Court was denied August 21, 1952.