[No. C038627. Third Dist. Aug. 20, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
SCOTT EDGAR MURRISON, Defendant and Appellant.

**COUNSEL**

Moss & Enochian, Steven R. Enochian and Mark Norcross for Defendant and Appellant.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, Tara L. Mueller and M. Anne Jennings, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ROBIE, J.**—In 1998, Scott Edgar Murrison placed rocks and gravel across Big Creek in Trinity County to divert most of its flow into a ditch for use on Big Creek Ranch. He failed to give notice to the Department of Fish and

Game (DFG) as required by Fish and Game Code section 1603. Murrison appeals the judgment enjoining him from diverting the creek without complying with Fish and Game Code section 1603.

Murrison asserts the amount diverted under his claimed pre-1914 appropriative water right in the waters of Big Creek cannot be limited by the application of the Fish and Game Code provisions. He also claims DFG cannot regulate his right to take water from Big Creek unless it pays him for his water rights. Murrison further claims the injunction is too broad. Finally, Murrison argues the trial court erred in assessing civil penalties.

Like owners of all property, Murrison's rights, if any, to the waters of Big Creek are subject to reasonable regulation by the State of California, in this case to protect its fish and wildlife. That right does not allow him to substantially alter Big Creek free of regulation.

Murrison, however, protests too much too soon. At this point he has *failed to provide notice* to DFG. DFG has not taken action which affects his water right. We reject Murrison's "takings" claim for this reason and also because he failed to raise this challenge in the trial court and because he failed to establish the existence of his claimed water right.

The trial court's injunction and imposition of civil penalties was within its discretion. We shall affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

To irrigate its pastures and raise cattle, the Big Creek Ranch has historically used water taken through a diversion ditch located on Big Creek.[1] Downstream from the Big Creek diversion ditch is a 12- to 15-foot-tall concrete dam and fish ladder.

The Murrison family purchased the ranch in 1971. Murrison traced Big Creek Ranch's genesis back to a homestead in 1878. Murrison also traced the ranch's water rights to the flows of Big Creek to deeds dated between 1870 and 1912. Murrison, however, did not quantify the amount of water the ranch has taken or how that water has been used.

Darrell Yount is a retired DFG warden with almost 32 years of experience. Yount met Murrison's father, Edgar Murrison, for the first time in the early 1970's. Since his father's death in 1994, Murrison has operated Big Creek Ranch.

---

[1]The Big Creek diversion ditch.

Every year Yount has been a game warden, the Murrisons have done work near the Big Creek diversion ditch and diverted water into their ditch. During some years, they have had to work in the stream for this purpose.[2] DFG entered into two 1-year streambed alteration agreements with Murrison's father—one in 1989 and one in 1990. The 1989 agreement required Murrison to maintain at least one and one-quarter inches of water flow over the downstream fish ladder.

In April 1999, the People filed a complaint against Murrison alleging two causes of action: one for violation of Fish and Game Code section 1603 and one for violation of Business and Professions Code section 17200. The complaint alleged that during the prior summer, Murrison placed rocks and gravel in the streambed of Big Creek to divert water into the Big Creek diversion ditch. The People sought injunctive relief and civil penalties. (Fish & G. Code, § 1603.1; Bus. & Prof. Code, §§ 17203 & 17206.)

We now turn to the events that precipitated this lawsuit. On July 4, 1998, Yount visited Big Creek and noticed equipment had been used to level a road to the creek near Big Creek diversion ditch. Two or three scoops of gravel had been removed from the bed of the stream by mechanical means and deposited on the bank. The gravel had been taken from the stream since Yount's prior visit to the site in June.

Yount returned to this site on July 23, 1998. This time, Yount saw rocks and gravel had been placed across the stream to make a dam.

Lieutenant Bob Taylor is a DFG patrol lieutenant. On August 13, 1998, he visited the site and took photographs of the rock and gravel diversion dam. Ninety-five percent of the stream flow was being diverted from Big Creek down the Big Creek diversion ditch.

Yount returned to the site on September 2, 1998. At that time, the rock and gravel dam extended across the entire width of the stream. Further, more gravel had been placed in the holes between the rocks. There was a six-and-one-half-inch-wide notch in the rock and gravel dam that allowed some water to bypass the dam and continue downstream to the concrete dam and fish ladder. The rock and gravel dam, however, diverted most of the water of Big Creek into the Big Creek diversion ditch.

Murrison did not notify DFG of his intent to alter the stream at any time in 1998, nor did he enter into a streambed alteration agreement with DFG.

Dave Hoopaugh is a DFG biologist. Hoopaugh took stream flow measurements on Big Creek in 1991 and 1997. He took those measurements to

---

[2] During some winters, the flows of the creek have completely washed away their diversion.

evaluate the Big Creek diversion ditch and develop recommendations to prevent or mitigate any adverse impacts on the fishery resources in Big Creek. Hoopaugh's primary emphasis was protecting steelhead trout.[3]

In 1991, Hoopaugh recommended the Big Creek Ranch allow between 2 and 15 cubic feet per second flow past its diversion. In 1997, Hoopaugh recommended one cubic foot per second as a minimum flow requirement. This was the absolute minimum that Hoopaugh thought would keep the fish in the creek alive. Equating this to the amount of water flowing over the fish ladder, Hoopaugh testified that one cubic foot per second would result in a depth of more than one and one-quarter inches of water, but he could not state how much more with any degree of accuracy.

Hoopaugh concluded that there was a potential substantial adverse impact in the stream resources of Big Creek from the Big Creek diversion ditch he observed in 1991 and 1992. The 1991 and 1992 diversions were substantially similar to the 1998 diversion. Thus, Hoopaugh concluded the Big Creek diversion ditch of 1998 created the potential for substantial adverse impact to the fishing resources of Big Creek. Hoopaugh further testified he believed one and one-quarter inches of depth over the fish ladder was insufficient to provide healthy fish habitat. Bernard Aguilar, a second DFG biologist, also testified the Big Creek diversion ditch did have or may have a substantial adverse effect on fish resources.

At trial, Murrison argued his water rights were not subject to Fish and Game Code section 1603. Further, Murrison argued his rock and gravel dam did not constitute a substantial alteration of the creek. Murrison asserted he was maintaining his waterworks and thus, his work fell within the exemption for maintenance contained in Fish and Game Code section 1603, subdivision (e).

On his own behalf, Murrison testified Big Creek typically dries up during the summer months, which coincides with prime irrigation months for the ranch. Murrison also testified over the years there always had been some type of diversion structure in Big Creek. Prior to 1990, the structure was simply gravel. Since 1990, it has consisted of large boulders with gravel and rocks between the boulders. The boulders were placed in the streambed with the permission of DFG. The boulders were then removed by Trinity County Waterworks in 1995 and later replaced by Murrison.

Murrison performed yearly maintenance on the Big Creek diversion ditch. The maintenance included shoveling gravel, cleaning out gravel from the

---

[3]Hoopaugh had observed three steelhead reds, or nests, upstream of the Big Creek diversion ditch.

stream in front of the headgate, and cleaning the ditch. Murrison admitted he cleaned out the gravel in front of his headgate in 1998. Murrison also admitted he placed all of the rocks that made up the diversion dam. Murrison asserted he always tried to keep an inch and one-half of water flowing over the fish ladder in compliance with the 1990 DFG streambed alteration agreement.

Murrison claimed he did not request a permit under Fish and Game Code section 1603 because he believed he was not doing anything substantial, but only performing basic maintenance on his irrigation system. Murrison testified that the Big Creek diversion ditch is approximately one inch lower in elevation than the height of the fish ladder. As a result, he must constantly adjust the rock and gravel diversion structure to ensure enough water goes through the diversion to maintain the flow on the fish ladder.

Murrison also presented the testimony of a fish and aquatic biologist, Keith Marine. Marine challenged the methodology of the DFG biologists in reaching their expert conclusions. Marine claimed Murrison had not created an "appreciable alteration of the natural stream bed" by virtue of his rock and gravel dam.

The trial court found Murrison had substantially altered or obstructed Big Creek without complying with the provisions of Fish and Game Code section 1603. The court concluded the 1989 and 1990 streambed agreements did not authorize Murrison to conduct the same or similar work in 1998. The court further rejected Murrison's reliance on the maintenance exemption contained in section 1603, subdivision (e) of the Fish and Game Code. The court rejected Murrison's argument he was exempt from the Fish and Game Code section 1603 process because the Big Creek diversion ditch was based on claimed pre-1914 water rights.

The court enjoined Murrison from working in Big Creek and operating his headgate. The court also imposed civil penalties of $10,000 under Fish and Game Code section 1603.1 and $1,500 under Business and Professions Code section 17206. In a posttrial motion, the court later modified the injunction to allow Murrison to operate his headgate, as long as Murrison moved no rocks or gravel, and performed no work in Big Creek. Murrison appeals.

DISCUSSION

I. *Application of Section 1603 to Water Right Holders*

Citing the California Constitution and the Water Code, Murrison argues his "water rights are not subject to regulation under Fish and Game Code

section 1603." While his challenge is much broader, Murrison's claim even extends to the initial notice requirement.[4] Further, he contends the DFG "cannot appropriate water" under the authority of Fish and Game Code section 1603. We reject these arguments.

In relevant part, Fish and Game Code section 1603, subdivision (a), provides: "It is unlawful for any person to substantially divert or obstruct the natural flow or substantially change the bed, channel, or bank of any river, stream, or lake designated by the department, or use any material from the streambeds, without first notifying the department of that activity, except when the department has been notified pursuant to Section 1601."[5]

We begin with a brief description of water rights under California law. California operates under a dual system of water rights that recognizes both the "appropriation" and "riparian" doctrines. (See *People v. Shirokow* (1980) 26 Cal.3d 301, 307 [162 Cal.Rptr. 30, 605 P.2d 859] (*Shirokow*).) "The riparian doctrine confers upon the owner of land contiguous to a watercourse the right to the reasonable and beneficial use of water on his land. The appropriation doctrine contemplates the diversion of water and applies to 'any taking of water for other than riparian or overlying uses.' [Citation.] Both riparian and appropriative rights are usufructuary only and confer no right of private ownership in the watercourse." (*Ibid.*, fn. omitted.)

---

[4] We are not confronted with the question of whether the trial court erred in determining Murrison substantially altered the bed of Big Creek, a factual finding Murrison did not challenge on appeal.

[5] Once notification is made under Fish and Game Code section 1603, "[t]he department, within 30 days from the date of receipt of that notice, or within the time determined by mutual written agreement, shall, when an existing fish or wildlife resource may be substantially adversely affected by that activity, notify the person of the existence of that fish or wildlife resource together with a description of the fish or wildlife, and shall submit to the person its proposals as to measures necessary to protect fish and wildlife. Upon a determination by the department of the necessity for onsite investigation or upon the request for an onsite investigation by the affected parties, the department shall notify the affected parties that it shall make an onsite investigation of the activity and shall make that investigation before it proposes any measure necessary to protect the fish and wildlife. The department's description of an existing fish or wildlife resource shall be specific and detailed and the department shall make available upon request the information upon which its conclusion is based that the resource may be substantially adversely affected." (Fish & G. Code, § 1603, subd. (a).) If DFG makes proposals to protect wildlife, DFG and the proponent of the activity then must attempt to negotiate a streambed alteration agreement. (Fish & G. Code, § 1603, subd. (b)(1).) If that process is ineffective, section 1603 provides for an expedited binding arbitration process. (Fish & G. Code, § 1603, subd. (b)(2).) "It is unlawful for any person to commence any activity affected by this section until the department has found that it will not substantially adversely affect an existing fish or wildlife resource or until the department's proposals, or the decisions of a panel of arbitrators, have been incorporated into the activity." (Fish & G. Code, § 1603, subd. (c).) In this case, we are not concerned about the postnotification stages because Murrison never notified DFG of his intent to substantially divert Big Creek.

"Common law appropriation originated in the gold rush days when miners diverted water necessary to work their placer mining claims. The miners adopted among themselves the priority rule of 'first in time, first in right,' and California courts looked to principles of equity and of real property law to adjudicate conflicting claims. [Citations.] Thus it was initially the law in this state that a person could appropriate water merely by diverting it and putting it to use." (*Shirokow, supra,* 26 Cal.3d at pp. 307-308.)

"The first appropriation statute was enacted in 1872 and provided for initiation of the appropriative right by the posting and recordation of notice. [Citation.] The nonstatutory method retained its vitality and appropriative rights were acquired by following either procedure." (*Shirokow, supra,* 26 Cal.3d at p. 308.)

"Both methods were superseded by the 1913 enactment of the Water Commission Act, which created a Water Commission and provided a procedure for the appropriation of water for useful and beneficial purposes. The main purpose of the act was 'to provide an orderly method for the appropriation of [unappropriated] waters.' [Citations.] ██ ██ By amendment in 1923, the statutory procedure became the exclusive means of acquiring appropriative rights."[6] (*Shirokow, supra,* 26 Cal.3d at p. 308, fn. omitted.)

 "Unlike real property rights, usufructuary water rights are limited and uncertain. The available supply of water is largely determined by natural forces." (*United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 104 [227 Cal.Rptr. 161].) "[I]n times of water shortage, all riparians must curtail their usage in order that they share the available water." (*Ibid.*) Further, "appropriators are limited by priorities in time; their rights are subordinate to the rights of preexisting holders, i.e., riparians and senior appropriators." (*Id.* at p. 105.)

a) *The Constitutional Argument*

All water rights are also limited by the provisions of article X, section 2 of the California Constitution which proscribes the waste or unreasonable use

---

[6]Appropriative rights initiated prior to the 1913 amendment (such as that claimed by Murrison) are not subject to this statutory scheme for purposes of acquisition and supervision of use. These rights are commonly referred to as "pre-1914 rights." At this time, the water right permit system is administered by the State Water Resources Control Board (Board). One intending to appropriate unappropriated water must file an application with the Board. After notice to affected parties, including DFG and other right holders on the stream, the Board may issue a permit to appropriate water under specific terms and conditions. After the water has been put to beneficial use, the permittee may apply for a license confirming the right. The right may be lost by nonuse. (Wat. Code, § 1200 et seq.)

or unreasonable method of use or *unreasonable method of diversion* of water. (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1241-1242 [99 Cal.Rptr.2d 294, 5 P.3d 853].)[7]

█ To argue that Fish and Game Code section 1603 does not apply to his stream alteration and, hence to his water rights, Murrison draws on one provision of California Constitution, article X, section 2 which provides, in part: "nothing herein contained shall be construed as depriving any . . . appropriator of water to which the appropriator is lawfully entitled." Murrison properly concedes this provision prohibits him from exercising his water right in a wasteful and unreasonable manner. (See *United States v. State Water Resources Control Bd., supra,* 182 Cal.App.3d at p. 105.) Murrison argues, however, the language demonstrates that the ban on unreasonable and wasteful use is the only permissible restriction on his right to take water from Big Creek. That is not the law. (*Ibid.*)

" 'Legislation with respect to water affects the public welfare and the right to legislate in regard to its use and conservation is referable to the police power of the state.' " (*Baldwin v. County of Tehama* (1994) 31 Cal.App.4th 166, 173 [36 Cal.Rptr.2d 886].) "[W]ater rights have been the subject of pervasive regulation in California." (*People v. Weaver* (1983) 147 Cal.App.3d Supp. 23, 30 [197 Cal.Rptr. 521].) The State of California has a substantial public interest in protecting its fields, streams, and wildlife. (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 434-435 [189 Cal.Rptr. 346, 658 P.2d 709].) The state owns the fish in its streams in trust for the public. (*California Trout, Inc. v. State Water Resources Control Bd.* (1989) 207 Cal.App.3d 585, 630 [255 Cal.Rptr. 184].) "[S]ection 1600 of the Fish and Game Code expressly indicates that the Legislature's intent

---

[7]Article X, section 2 of the California Constitution states: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which the owner's land is riparian under reasonable methods of diversion and use, or as depriving any appropriator of water to which the appropriator is lawfully entitled. This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained."

in enacting section 1603 was to provide for the protection and conservation of fish and wildlife resources, a goal that the Legislature declared to be 'of [the] utmost public interest.' " (*People v. Ramsey* (2000) 79 Cal.App.4th 621, 636 [94 Cal.Rptr.2d 301].)

The requirement in Fish and Game Code section 1603 that Murrison notify DFG of his intent to substantially alter or divert Big Creek furthers the state's substantial interest in the protection of the state's fish and wildlife. This statutory requirement is inherent in the state's sovereign power to protect its wildlife and Murrison's water rights are subject to these powers. ██ A water right, whether it predates or postdates 1914 is not exempt from reasonable regulation. Just as a real property owner does not have an unfettered right to develop property in any manner he or she sees fit (see *Rutherford v. State of California* (1987) 188 Cal.App.3d 1267, 1286 [233 Cal.Rptr. 781]), an owner of a water right may be similarly restricted.

b) *The Water Code Section 1201 Argument*

Murrison also cites Water Code section 1201. That section provides: "All water flowing in any natural channel, excepting so far as it has been or is being applied to useful and beneficial purposes upon, or in so far as it is or may be reasonably needed for useful and beneficial purposes upon lands riparian thereto, or otherwise appropriated, is hereby declared to be public water of the State and subject to appropriation in accordance with the provisions of this code." ██ According to Murrison, because the Board does not allocate or otherwise distribute water rights that were obtained before 1914, Fish and Game Code section 1603 does not apply to those rights. Murrison's conclusion does not follow from his premise.

As we have already noted, appropriative water rights were first available by simply diverting water and putting it to use. (*Shirokow, supra,* 26 Cal.3d at p. 308.) In 1913, the Legislature codified the process for appropriation of water and created an orderly regulatory scheme to establish those rights. (*Ibid.*) The only substantive difference between appropriative water rights obtained prior to 1914 and those obtained after 1914 is that post-1914 rights must go through the administrative process before the Board. (*Fullerton v. State Water Resources Control Bd.* (1979) 90 Cal.App.3d 590, 602 [153 Cal.Rptr. 518] ["the courts have consistently held that the 1913 statutory scheme was only a regulation of the existing privilege to appropriate water"].) This is precisely the purpose of Water Code section 1201. The change in administration of these rights does not give pre-1914 rights an exception from the police powers of the state. Just as post-1914 rights are subject to the regulatory powers of the state to protect endangered fish (see *Department of*

*Fish & Game v. Anderson-Cottonwood Irrigation Dist.* (1992) 8 Cal.App.4th 1554, 1558-1564 [11 Cal.Rptr.2d 222]), so too are rights acquired prior to 1914. The trial court properly concluded Murrison, like all other citizens of this state, is subject to the requirements of Fish and Game Code section 1603.

### c) *The Claimed Water Right Has Not Been Affected*

■ Despite Murrison's efforts to make this case center on his claim that DFG cannot limit his claimed water right by regulating his diversion from Big Creek, the claim is misplaced because Murrison has refused to provide the initial notification required by the statute. The provision of the Fish and Game Code Murrison violated was the requirement that he *notify* DFG *before* he substantially diverted or obstructed the natural flow of Big Creek. The mere imposition of a notice requirement does not impact Murrison's ability to exercise his claimed water right. As a result, the provisions of the Fish and Game Code which *could* affect the amount to be diverted were never applied by DFG. Murrison's challenge to DFG's ability to restrict the amount of water he may take must wait until he notifies DFG of his intent to divert the stream *and* his water rights have been limited in some manner. (*Willadsen v. Justice Court* (1983) 139 Cal.App.3d 171, 178 [188 Cal.Rptr. 488] [" 'one will not be heard to attack a statute on grounds that are not shown to be applicable to himself' "].)

For these same reasons, we reject Murrison's argument Fish and Game Code section 1603 operates as an appropriation of his right to take water. The only restriction imposed on Murrison at this stage of the case was the requirement he give DFG notice of his intent to substantially obstruct or divert the natural flow of the stream. This case simply does not raise the issue of whether DFG may limit Murrison's claimed water right.

## II. *Takings Claim*

■ Murrison argues DFG may not "take [his] water, for which it has no appropriative right, . . . without paying for it under eminent domain law." Murrison failed to make this argument in the trial court. Having failed to raise this contention in the trial court, he may not raise it here for the first time. (*Holmes v. California Nat. Guard* (2001) 90 Cal.App.4th 297, 313 [109 Cal.Rptr.2d 154].)

■ Even were we to reach Murrison's "takings," claim, we would find that it is not ripe. Murrison's claim is of the regulatory variety, as opposed to

a physical taking.[8] " 'Where the government authorizes a physical occupation of property (or actually takes title), the Takings Clause generally requires compensation. [Citation.] But where the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole.' [Citation.] An individualized assessment of the impact of the regulation on a particular parcel of property and its relation to a legitimate state interest is necessary in determining whether a regulatory restriction on property use constitutes a compensable taking." (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 9-10 [32 Cal.Rptr.2d 244, 876 P.2d 1043].) " '[A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.' [Citation.]" (*Id.* at p. 10.)

Here, Murrison failed to notify DFG of the diversion he proposed. He never reached the point where DFG attempted to impose any limits on the amount of water Murrison would be allowed to take from Big Creek. It is entirely possible DFG may have approved his diversion without any restrictions. Even if DFG imposed restrictions, they might have been of such a limited duration or nature that they did not impair Murrison's ability to draw sufficient water for his reasonable uses on the Big Creek Ranch. Moreover, the arbitration panel provided for in the statute could have rejected DFG's requirements and imposed no restrictions on Murrison's water rights. Only if, and when, impermissible restrictions are imposed may we determine whether a compensable taking has occurred. Murrison's challenge is not yet ripe.

We also question whether Murrison has established a water right. While he traced the origins of his claimed right, he failed to present any testimony about the nature and quantity of the right at any time, including the period since the rights were created to the date of trial. ■ An appropriative right is limited to the amount of water the appropriator can put to a reasonable beneficial use *and* has put to beneficial use subject to the rights of riparians and senior appropriators. (*Pleasant Valley Canal Co. v. Borror*

---

[8]Because DFG has not yet imposed any restrictions on Murrison's right to take water, we also have no occasion to address the holding in *Tulare Lake Basin Water Storage Dist. v. U.S.* (Fed.Cl. 2001) 49 Fed.Cl. 313, 319 (trial court), that the requirement that a recipient of water under contracts with the Central Valley project suffers a physical taking of their property when the federal government imposes water use restrictions to protect endangered species.

(1998) 61 Cal.App.4th 742, 753 [72 Cal.Rptr.2d 1]; *United States v. State Water Resources Control Bd., supra,* 182 Cal.App.3d at p. 105.) While those rights may be lost through disuse, they may not be expanded without further appropriations. (*Pleasant Valley Canal Co. v. Borror, supra,* at p. 753.) Having failed to present evidence on the amount of water historically used by the Big Creek Ranch and the manner in which it was put to use throughout the past 100 years, Murrison has failed to establish a prima facie pre-1914 appropriative right.

## III. *Injunction*

 Murrison argues "[i]n the absence of any evidence of a substantial diversion, and the absence of any evidence that [his] activity 'may' harm fish or wildlife, the trial court clearly exceeded its jurisdiction and authority in enjoining this activity." We disagree.

The injunctive relief here was sought under Fish and Game Code section 1603.1 *and* Business and Professions Code section 17203. Under Business and Professions Code section 17203, the court "may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition." (Bus. & Prof. Code, § 17203.)

Fish and Game Code section 1603 is a legitimate exercise of the state's police power to protect California's wildlife resources. (See pt. I, *ante.*) Murrison's violation of this law in conjunction with its business practices of irrigating its hay and pastures is, by definition, unfair competition. (*Hewlett v. Squaw Valley Ski Corp.* (1997) 54 Cal.App.4th 499, 519 [63 Cal.Rptr.2d 118] (*Squaw Valley*) [" 'An "unlawful business activity" includes " 'anything that can properly be called a business practice and that at the same time is forbidden by law.' " ' "].)

In *Squaw Valley, supra,* 54 Cal.App.4th 499, William Hewlett and Placer County challenged Squaw Valley's cutting of trees for a ski run in violation of the Z'berg-Nejedly Forest Practice Act (Pub. Resources Code, § 4511 et seq.), a conditional use permit and a temporary restraining order. (54 Cal.App.4th at p. 509.) We rejected Squaw Valley's argument an injunction that prohibited them from utilizing a particular area and cutting trees was invalid because it was unrelated to the proven unfair business practices. (*Id.* at p. 541.) The "remedial power granted under [Business and Professions Code section 17203] is 'extraordinarily broad. Probably because . . . unfair business practices can take many forms, the Legislature has given the courts the power to fashion remedies to prevent their "use or employment" in

whatever context they may occur.' [Citation.] This power 'necessarily includes the authority to make orders to prevent such activities from occurring in the future. While an injunction against future violations might have some deterrent effect, it is only a partial remedy since it does not correct the consequences of past conduct. [Citation.] An "order which commands [a party] only to go and sin no more simply allows every violator a free bite at the apple." [Citation.]' [Citation.] Injunctive relief 'may be as wide and diversified as the means employed in perpetration of the wrongdoing.' [Citation.]" (*Id.* at p. 540.) The record in Squaw Valley demonstrated "Squaw Valley's complete disregard for procedures designed to protect the environment and forest resources." (*Id.* at p. 541.) Thus, we found the broad injunctive relief proper. (*Id.* at p. 542.)

Here, the evidence established Murrison substantially diverted the natural flow of Big Creek in 1998 and before. Despite the efforts of DFG to work with the Murrisons, the Murrisons have often refused to notify DFG of their activities in the streambed, leaving them to the discovery of game wardens. The trial court's injunction was proper. For the same reasons this injunctive provision is appropriate under Business and Professions Code section 17203, Fish and Game Code section 1603.1 also supports imposition of this relief.

## IV. *Imposition of Penalties*

■ Murrison also argues the trial court erred in determining the amount of penalties imposed. We disagree.

Business and Professions Code "Section 17206, subdivision (a), requires a court to impose a penalty for each unlawful business practice committed. However, the amount of the penalty lies within the court's discretion." (*Squaw Valley, supra,* 54 Cal.App.4th at p. 537.) Based on Murrison's conduct we have described already in this opinion, we conclude the $1,500 penalty imposed was not an abuse of discretion.

Fish and Game Code section 1603.1 provides: "(a) Every person who violates Section 1603 is subject to a civil penalty of not more than twenty-five thousand dollars ($25,000) for each violation. [¶] (b) The civil penalty imposed for each separate violation pursuant to this section is separate, and in addition to, any other civil penalty imposed for a separate violation pursuant to this section or any other provision of law. [¶] (c) In determining the amount of any civil penalty imposed pursuant to this section, the court shall take into consideration the nature, circumstance, extent, and gravity of the violation. In making this determination, the court may consider the degree of toxicity and volume of the discharge, whether the effects of the

violation may be reversed or mitigated, and with respect to the defendant, the ability to pay, the effect of any civil penalty on the ability to continue in business, any voluntary cleanup efforts undertaken, any prior history of violations, the gravity of the behavior, the economic benefit, if any, resulting from the violation, and any other matters the court determines justice may require."

Under this section, the People sought penalties of $25,000 for each of the three violations they alleged in their complaint. The trial court rejected this request. The court credited the People's expert testimony concerning the potential harm to steelhead trout caused by Murrison's actions. As a result, the court imposed penalties of $10,000 for a single violation in July 1998. Based upon Murrison's conduct, the evidence he continuously refused to notify DFG of his unauthorized yearly diversions, and the nature of the current diversion, we conclude the trial court did not abuse its discretion in imposing this penalty.

## DISPOSITION

The judgment is affirmed. Murrison shall bear costs on appeal. (Cal. Rules of Court, rule 26(a)(1).)

Raye, Acting P. J., and Kolkey, J., concurred.

A petition for a rehearing was denied September 16, 2002, and appellant's petition for review by the Supreme Court was denied November 20, 2002.