[No. C052770. Third Dist. Oct. 29, 2007.]

LLOYD L. PHELPS, JR., et al., Plaintiffs and Appellants, v.
STATE WATER RESOURCES CONTROL BOARD et al., Defendants and
Respondents;
DEPARTMENT OF WATER RESOURCES et al., Real Parties in Interest
and Respondents.

COUNSEL

Nomellini, Grilli & McDaniel, Dante John Nomellini, Daniel A. McDaniel, Dante John Nomellini, Jr.; and John Herrick for Plaintiffs and Appellants.

Edmund G. Brown, Jr., Attorney General, Mary E. Hackenbracht, Assistant Attorney General, Clifford T. Lee, Deputy Attorney General; and Erin K. L. Mahaney for Defendants and Respondents.

Edmund G. Brown, Jr., Attorney General, Mary E. Hackenbracht, Assistant Attorney General, and Bruce Reeves, Deputy Attorney General, for Real Party in Interest and Respondent Department of Water Resources.

O'Laughlin & Paris, Tim O'Laughlin, William C. Paris, III and Kenneth P. Petruzzelli for Real Party in Interest and Respondent San Joaquin River Group Authority.

OPINION

CANTIL-SAKAUYE, J.—Plaintiffs Lloyd L. Phelps, Jr., Gary Phelps, Joey P. Ratto, Jr., and Ronald D. Conn farm land on Upper Roberts Island in the Sacramento-San Joaquin Delta (Delta) under licenses issued by defendant State Water Resources Control Board (SWRCB). The SWRCB imposed civil penalties against plaintiffs pursuant to Water Code section 1052 for unauthorized diversion of water in 2000 and 2001.[1] (SWRCB Order No. WRO 2004-0004, adopted Feb. 19, 2004 (Order WRO 2004-0004).) Plaintiffs filed a petition for writ of mandate and complaint for declaratory relief which challenged Order WRO 2004-0004 on numerous grounds.[2] The court denied all requested relief and plaintiffs appeal. We conclude most of plaintiffs' claims are time-barred under section 1126, and the court's other findings are supported by substantial evidence. We therefore affirm the judgment.

---

[1] Water Code section 1052 reads in relevant part:

"(a) The diversion or use of water subject to this division other than as authorized in this division is a trespass.

"(b) Civil liability may be administratively imposed by the board pursuant to Section 1055 for a trespass as defined in this section in an amount not to exceed five hundred dollars ($500) for each day in which the trespass occurs."

Undesignated statutory references are to the Water Code. Statutory references to "the board" are to the SWRCB. (Former § 1003.5.)

[2] Plaintiffs named the California Department of Water Resources (DWR), a subdivision of the Resources Agency that holds certain water rights, and the San Joaquin River Group Authority, a joint powers authority which appeared and participated in the hearing which resulted in Order WRO 2004-0004, as real parties in interest in their petition/complaint. Both filed respondents' briefs in this appeal.

# BACKGROUND

## A. *The Delta Watershed*

The SWRCB describes the Delta watershed as "the largest watershed in California. . . . [T]he Sacramento River and the San Joaquin Rivers [*sic*] flow into the Delta. The outflow from the Delta flows into Suisun Bay and then into San Francisco Bay. [¶] . . . The availability of water throughout the Delta watershed is generally affected by the demand for water of suitable quality within the Delta and Suisun Marsh. Without adequate freshwater outflow from the Delta into Suisun Bay, seawater intrudes into the Delta and degrades water quality. High salinity and low Delta outflows can be harmful to agricultural production, municipal and industrial uses of water, and to various species of fish and wildlife throughout the Bay-Delta estuary." (*In re Water Right Permits in the Sacramento-San Joaquin Delta Watershed*, SWRCB Dec. No. 1594 (Nov. 17, 1983) p. 2 (Decision 1594).)

Under authority granted in sections 1253 and 1394, the SWRCB included standard Water Right Permit Term 80 (Term 80) in over 500 permits for diversion within the Delta watershed.[3] As originally drafted, Term 80 read: " 'The State Water Resources Control Board reserves jurisdiction over this permit for the purpose of conforming the season of diversion to later findings of the Board on prior applications involving water in the Sacramento River Basin and Delta. Action by the Board will be taken only after notice to interested parties and opportunity for hearing.' " (Decision 1594, *supra*, at p. 4.)

"The Central Valley Project (CVP) operated by the [United States] Bureau of Reclamation ([USBR]) and the State Water Project (SWP) operated by the [real party in interest DWR] substantially alter flows within the Delta watershed. . . . [¶] . . . [¶] The Projects[4] store winter and spring runoff and

---

[3] Section 1253 (allowance of appropriation for beneficial purposes) provides: "The board shall allow the appropriation for beneficial purposes of unappropriated water under such terms and conditions as in its judgment will best develop, conserve, and utilize in the public interest the water sought to be appropriated."

Section 1394 (SWRCB's reservation of jurisdiction to alter terms and conditions in permit) reads in relevant part: "(a) The board may reserve jurisdiction, in whole or in part, to amend, revise, supplement, or delete terms and conditions in a permit under either of the following circumstances: [¶] (1) If the board finds that sufficient information is not available to finally determine the terms and conditions which will reasonably protect vested rights without resulting in waste of water or which will best develop, conserve, and utilize in the public interest the water sought to be appropriated, and that a period of actual operation or time for completion of studies will be necessary in order to secure the required information. . . ."

[4] "The term 'Projects' refers jointly to the SWP and CVP." (Decision 1594, *supra*, at p. 5, fn. 1.)

then release and transport it to satisfy demands within the Sacramento River Basin, San Joaquin Basin, Tulare Basin, San Francisco Bay Area communities and Southern California communities." (Decision 1594, *supra*, at pp. 4–5.)

In 1978, the SWRCB required the USBR (United States Bureau of Reclamation) and DWR to "meet specified water quality standards in the Delta and Suisun Marsh . . . . The effect of the standards [was] to require the Projects to release water from storage or to curtail diversions when the flow entering the Delta would otherwise be insufficient to meet the water quality standards." (Decision 1594, *supra*, at p. 7, citing *In re Permit 12720 (Application 5625) and Other Permits of U.S. Bureau of Reclamation* SWRCB Dec. No. 1485 (Aug. 16, 1978) p. 10 (Decision 1485).) Up to that date, "the Board [had] made no general effort to regulate water users' season of diversion on a real-time basis. Permits were issued for a fixed season of diversion with the understanding that water [might] not always be available to a later permittee after satisfying the rights of riparians and earlier appropriators." (Decision 1594, *supra*, at p. 25.)

B. *Water Right Permit Term 91*

After the SWRCB adopted Decision 1485, the USBR and the DWR "protested numerous water right applications within the Delta watershed. The protests were based on claims by the [USBR] and the [DWR] that diversion by new applicants at certain times would force the Projects to release more stored water to meet the Delta water quality standards established by Decision 1485. As an interim solution to the problem, the Board adopted Standard Water Right Permit Term 91 on March 25, 1980," thereby allowing the SWRCB to process new water right applications pending development of a long-term method for determining when water was available for appropriation.[5] (Decision 1594, *supra*, at pp. 8–9.) After 1985, the SWRCB included Term 91 (Standard Water Right Permit Term 91) in nearly all water right permits and licenses issued as an original permit term or through amendment. (*Id.* at pp. 8–9, 35–36; SWRCB Order WR 84-2, pp. 57–58 (Order WR 84-2).)

---

[5] The SWRCB also revised Term 80 to read: " 'The State Water Resources Control Board reserves jurisdiction over this permit to change the season of diversion to conform to the results of a comprehensive analysis of the availability of unappropriated water in the [name of river basin or watershed]. Action to change the season of diversion will be taken only after notice to interested parties and opportunity for hearing.' " (Decision 1594, *supra*, at p. 4.)

Term 91 provides:

" 'No diversion is authorized by this permit when satisfaction of inbasin entitlements requires release of supplemental Project water by the Central Valley Project or the State Water Project.

" 'a. Inbasin entitlements are defined as rights to divert water from streams tributary to the Sacramento-San Joaquin Delta or the Delta for use within the respective basins of origin or the Legal Delta, unavoidable natural requirements for riparian habitat and conveyance losses, and flows required by the Board for maintenance of water quality and fish and wildlife. Export diversions and Project carriage water are specifically excluded from the definition of inbasin entitlements.

" 'b. Supplemental Project water is defined as water imported to the basin by the Projects, and water released from Project storage, which is in excess of export diversions, Project carriage water, and Project inbasin deliveries.

" 'The Board shall notify the permittee of curtailment of diversion under this term after it finds that supplemental Project water has been released or will be released. The Board will advise the permittee of the probability of imminent curtailment of diversion as far in advance as practicable based on anticipated requirements for supplemental Project water provided by the Project operators.' " (Order WR 84-2, *supra*, at pp. 57–58.)

In 1983, the SWRCB approved the real-time method of calculation and implementation of Term 91 set forth in State Water Resources Control Board Order WR 81-15 (Order WR 81-15). (Order WR 84-2, *supra*, at pp. 60, 61; Order WR 81-15, *supra*, at pp. 1, 5–8.)[6] It found that "in view of the small quantity of water involved, it [was] inefficient to establish real-time regulation of hundreds of parties diverting small quantities of water." (Decision 1594, *supra*, at p. 27.) Accordingly, the SWRCB applied the Term 91 method of calculating water availability "only to those Term 80 permits which authorize[d] direct diversion at a rate of 1.0 cfs or more or which authorize[d]

---

[6] Order WR 81-15 described the triggering formula as: SR > D + CW; with SR representing net storage releases from Shasta, Oroville and Folsom reservoirs plus imports from the Trinity River CVP (Central Valley Project) complex; D representing the total export diversion for the SWP (State Water Project) and the CVP at Clifton Court Forebay, Tracy Pumping Plant, and the Contra Costa Canal Intake; and CW representing carriage water, that is, "the amount of additional Delta outflow required to compensate for currents created by the export pumps." (Decision 1594, *supra*, at p. 13.) Decision 1594 obtained the same outcome with a different equation: AW = (EX + CW) - SR; with AW representing available water; EX representing exports through the Delta-Mendota Canal, Contra Costa Canal, and California Aqueduct (EX is equivalent to D in the Order WR 81-15 equation); SR representing project storage releases and imports from the Trinity River; and CW representing carriage water.

diversion to storage of 100 AF per year or more."[7] (Decision 1594, *supra*, at p. 27; see Order WR 84-2, *supra*, at pp. 58–59.)

### C. *Notice to Plaintiffs*

Pursuant to Decision 1594 and Order WR 84-2, the SWRCB included Term 91 in the four water right permits issued to plaintiffs in 1985. Thereafter, the SWRCB issued licenses to the two Phelpses (1996 and 1999),[8] Ratto (1995), and Conn (1998). Each water right license included Term 91. None of the plaintiffs challenged the SWRCB's inclusion of Term 91 in his permit or license.

On June 28, 2000, the SWRCB sent plaintiffs a document entitled "Notice of Curtailment of Water Diversion During 2000." The first paragraph read: "Your permit or license for the appropriative water right identified by the application number on the mailing label above, contains a term (Standard Term 91) that prohibits diversion of water when satisfaction of inbasin entitlements requires release of stored water (supplemental Project water) by the Central Valley Project of the State Water Project. *You are hereby notified that the State Water Resources Control Board has determined that supplemental Project water is being released in the Sacramento-San Joaquin Delta Watershed.*" (Italics added.)

The second paragraph stated in large, bold type: "**YOU MUST IMMEDIATELY DISCONTINUE WATER DIVERSION UNDER THE SPECIFIED APPROPRIATIVE WATER RIGHT FROM THE DATE OF RECEIPT OF THIS NOTICE THROUGH AUGUST 31, 2000, UNLESS NOTIFIED EARLIER.**"

The notice also explained that failure to comply with the notice of curtailment could result in imposition of administrative civil liability, including monetary penalties "not to exceed $500 per day . . . ."

The SWRCB sent plaintiffs a second set of curtailment notices on June 4, 2001. The notices directed plaintiffs to "immediately discontinue water diversion" through August 31, 2001. At no time did plaintiffs challenge the 2000 and 2001 notices of curtailment.

---

[7] The term "cfs" means "cubic feet per second." (See *North Kern Water Storage Dist. v. Kern Delta Water Dist.* (2007) 147 Cal.App.4th 555, 561 [54 Cal.Rptr.3d 578].) "AF" refers to an acre-foot, "[t]he volume of water, 43,560 cubic feet, that will cover an area of one acre to a depth of one foot." (American Heritage Dict. (2d college ed. 1985) p. 75.)

[8] Two licenses are held by "Thelma B. Phelps, sole surviving trustee under Lloyd L. Phelps and Thelma B. Phelps Family Trust." Without explanation of their relationship to the licensees, the petition for writ of mandate simply alleges that plaintiffs Lloyd L. Phelps, Jr., and Gary Phelps are brothers who jointly own and farm property on Roberts Island.

On July 2, 2002, the chief of the SWRCB Division of Water Rights (Division) sent plaintiffs separate administrative civil liability complaints pursuant to section 1055.[9] The complaints charged plaintiffs with the unauthorized diversion of water during the 2000 and 2001 Term 91 curtailment periods. The chief proposed civil liability in the following amounts: Phelps—$22,500 out of a potential maximum of $138,000; Ratto—$3,750 out of a potential maximum of $69,000; and Conn and Ron Silva—$14,250 out of a potential maximum of $69,000. On plaintiffs' request, the SWRCB set a public hearing on January 14, 2003, on the complaints for civil liability. After hearing, the SWRCB issued Order WRO 2004-0004 on February 19, 2004, imposing civil penalties of $45,000 against the Phelpses, $7,000 against Ratto, and $10,000 against Conn.

## DISCUSSION

### I.

### *Standard of Review*

Code of Civil Procedure section 1094.5 governs judicial review of water right orders issued by the SWRCB. (§ 1126, subds. (b), (c).) The trial court's inquiry in such a challenge "shall extend to the questions whether the [SWRCB] has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the [SWRCB] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence. [¶] . . . Where it is claimed that the findings are not supported by the evidence, in cases in which

---

[9] Section 1055 (complaint, service, hearing) provides:

"(a) The executive director of the board may issue a complaint to any person or entity on which administrative civil liability may be imposed pursuant to Section 1052, Section 1536, Section 1845, or Section 5107. The complaint shall allege the act or failure to act that constitutes a trespass or violation, the provision of law authorizing civil liability to be imposed, and the proposed civil liability.

"(b) The complaint shall be served by personal notice or certified mail, and shall inform the party served that the party may request a hearing not later than 20 days from the date the party was served. The hearing shall be before a member of the board as it may specify.

"(c) After any hearing, the member shall report a proposed decision and order to the board and shall supply a copy to the party served with the complaint, the board's executive director, and any other person requesting a copy. The member of the board acting as hearing officer may sit as a member of the board in deciding the matter. The board, after making an independent review of the record and taking any additional evidence as may be necessary that could not reasonably have been offered before the hearing officer, may adopt, with or without revision, the proposed decision and order.

"(d) Orders setting administrative civil liability shall become effective and final upon issuance thereof and payment shall be made."

the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence. In all other cases, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." (Code Civ. Proc., § 1094.5, subds. (b), (c).)

On appeal from a judgment denying a petition for writ of mandate under Code of Civil Procedure section 1094.5, we "review[] the record as a whole to determine whether the trial court's findings are supported by substantial evidence." (*Hall v. Court Reporters Bd. of California* (2002) 98 Cal.App.4th 633, 637 [119 Cal.Rptr.2d 847] (*Hall*).) In this context, the word " ' " 'substantial' . . . clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must be reasonable in nature, credible, and of solid value . . . ." ' " (*DiMartino v. City of Orinda* (2000) 80 Cal.App.4th 329, 336 [95 Cal.Rptr.2d 16].) The testimony of a single witness can constitute substantial evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479].)

If plaintiffs contend that " ' "some particular issue of fact is not sustained, they are required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence*. Unless this is done the error is deemed to be waived." ' " (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 749 [39 Cal.Rptr.3d 189] (*SWRCB Cases*).)

We independently review questions of law, "giving *deference* to the determination of the agency *appropriate* to the circumstances of the agency action.' [Citation.]" (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)

## II.

### *Plaintiffs' Challenges to Term 91 Are Time-barred*

Plaintiffs challenge the SWRCB's imposition of Term 91 diversion restrictions on grounds that:

(1) The SWRCB abused its discretion by imposing the restrictions without determining that the restrictions "would achieve the purpose for which they were imposed," that is, without making adequate water quality findings;

(2) The SWRCB's implementation of the diversion restrictions deprived plaintiffs of their rights under the Watershed Protection Act (§§ 11460–11463);

(3) The SWRCB's implementation of the diversion restrictions deprived plaintiffs of their rights under the Delta Protection Act (DPA; §§ 12200–12205);

(4) The SWRCB's implementation of the diversion restrictions deprived plaintiffs of their "first in time, first in right seniority" over CVP and SWP (Projects) water rights; and

(5) The SWRCB based implementation of the diversion restrictions on "wrongfully substituted Delta outflow standards." (Capitalization omitted.)

■  We conclude plaintiffs' failure to challenge imposition of Term 91 on these grounds within the time period set forth in section 1126, subdivision (b) bars judicial review of the issues.

■  Section 1126, subdivision (b) provides: "Any party aggrieved by any decision or order may, *not later than 30 days from the date of final action by the board*, file a petition for a writ of mandate for review of the decision or order. Except in cases where the decision or order is issued under authority delegated to an officer or employee of the board, reconsideration before the board is not an administrative remedy that is required to be exhausted before filing a petition for writ of mandate." (Italics added.) Subdivision (d) of section 1126 bars judicial review of the SWRCB decision or order "[i]f no aggrieved party petitions for a writ of mandate within the time provided by this section . . . ."

The court applied section 1126, subdivision (b) in *North Gualala Water Co. v. State Water Resources Control Bd.* (2006) 139 Cal.App.4th 1577 [43 Cal.Rptr.3d 821], a challenge to the SWRCB's jurisdiction to compel the company to obtain a permit to pump groundwater. (*Id.* at p. 1580.) The court held that the company waived its challenge to the SWRCB's interpretation of a term contained in its existing permit by failing to raise the issue within 30 days of the SWRCB's issuance of orders premised on the disputed interpretation. (*Id.* at pp. 1606–1607.) The court explained that the company "could not, consistent with section 1126, manifest its acceptance of the conditions [placed on the new permit] and then wait until nearly two years later to challenge the premise on which they were self-evidently based." (*Id.* at p. 1607; see also *County of Imperial v. McDougal* (1977) 19 Cal.3d 505, 511 [138 Cal.Rptr. 472, 564 P.2d 14] [challenge barred if landowner "has acquiesced therein by either specifically agreeing to the [challenged] condition or failing to challenge its validity, and accepted the benefits afforded by the permit"].)

In this case, plaintiffs had four opportunities to challenge the SWRCB's decision to include Term 91 in their permits and licenses before the SWRCB

imposed civil penalties in 2002. First, plaintiffs could have raised the arguments when the SWRCB included Term 91 in the permits issued in 1985 pursuant to Decision 1594 and Order WR 84-2. Second, plaintiffs could have raised these arguments when the SWRCB included Term 91 in the licenses it issued to plaintiffs between 1995 and 1998. Third, plaintiffs could have challenged the 2000 notices of curtailment of water diversion they received in June 2000. Fourth, they could have challenged the 2001 notices of curtailment of water diversion they received in July 2001. Plaintiffs raised these issues for the first time at the hearing on the SWRCB's complaints for administrative civil liability which resulted in Order WRO 2004-0004.

On appeal, plaintiffs repeat the arguments made in the trial court that they were not required to comply with section 1126, subdivision (b) at any time before the SWRCB served the complaints against them for administrative civil liability. There is no merit in plaintiffs' arguments.

### A.  Challenge to Issuance of Permits and Licenses

Plaintiffs characterize their arguments as "as applied" rather than "facial" challenges to implementation of Term 91. Plaintiffs maintain that their challenges to the SWRCB's action were not ripe for review until the chief of the Division exercised his discretion to interpret and apply Term 91 to them during the summers of 2000 and 2001. Citing Evidence Code section 500,[10] they also contend that it was the SWRCB's "burden to demonstrate that notwithstanding the authority, i.e., discretion, afforded by WR 81-15, on its face, Term 91 nevertheless 'inevitably pose[s] a present total and fatal conflict' with the Watershed Protection Statute, Delta Protection Act and Rule of Priority and that there is no 'future hypothetical situation' under which Term 91 could be applied consistent with those laws." We are not persuaded by plaintiffs' attempt to circumvent the section 1126 time bar by creating a false distinction between a "facial" and "as applied" challenge to Term 91.

At the hearing on plaintiffs' petition for writ of mandate, the parties acknowledged that the existence of the claimed distinction between a "facial" and "as applied" challenge to Term 91 turned on the scope of discretion granted to the chief of the Division under Order WR 81-15. Findings 17, 18 and 19 of Order WR 81-15 delegated the following aspects of Term 91's implementation to the chief of the Division:

"17. In order to allow for timely implementation under Term 91, authority to review technical data, determine compliance with the conditions in Finding

---

[10] Evidence Code section 500 states: "Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting."

12 herein [whether supplemental water and other conditions exist], decide whether to implement Term 91, and notify appropriators of the begining [*sic*] and ending of diversion restrictions will be delegated to the Chief, Division of Water Rights.

"18. As experience with the operation of Term 91 is gained, additional exceptions to the use of the term in permits and licenses may be indicated. The Chief, Division of Water Rights will be granted authority to institute such exceptions after providing opportunity for [SWRCB] comment.

"19. Experience may also indicate that there are short periods of time when it would be impractical to implement the diversion restrictions in Term 91 in spite of compliance with the conditions set forth in Finding 12 herein. The delegation of authority to the Chief, Division of Water Rights will include authority to determine such situations." (Order WR 81-15, *supra*, at p. 10.)

The court requested supplemental declarations "that put[] forth with more clarity how [the Term 91] formula is actually used and how the discretion, if any, aside from additional exceptions, aside from this short time frame neither of which were applicable or relevant to this particular lawsuit, how it is used. [¶] Is there any judgment involved in the determination of carriage water; or is that just addition of these eighteen variables that are put forth in the reports . . . ."

The SWRCB submitted the declaration of John O'Hagan, a supervising water resource control engineer with the Division which described how the Division used mathematical formulas to determine whether the Term 91 criteria were satisfied. In O'Hagan's opinion, the chief exercised no discretion in the calculation of the carriage water value or the supplemental Projects' water value. Plaintiffs offered no evidence to contradict O'Hagan's declaration.

The trial court found that "Order WR 81-15 and Decision 1594 provided detailed formulas, specific definitions and precise directions for the chief of [the SWRCB's] division of water rights to use in calculating when the conditions for implementing diversions under Term 91 have been triggered, in deciding whether to implement Term 91, and in notifying Term 91 permittees and licensees about the beginning and end of diversion curtailments. Order WR 81-15 and Decision 1594 left virtually no issue regarding Term 91 language, policy objectives or methods of calculation to the discretion of the chief in implementing Term 91 curtailments in individuals cases."

Based on our independent review, we conclude that Order WR 81-15 and Decision 1594 cannot, in this case, be read to grant the chief of the Division

"broad discretion" in the implementation of Term 91. The discretionary language in findings 18 and 19 of Order WR 81-15 refers to situations inapplicable to plaintiffs. We also conclude that the record supports the trial court's factual findings regarding the nondiscretionary manner in which the chief implemented finding 17 by utilizing the formulas set forth in Order WR 81-15 and Decision 1594.[11]

■ We also reject plaintiffs' argument that their claims were not ripe for review when the SWRCB issued the permits and licenses which contained Term 91. "The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions. [Citation.] It is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion. . . . [T]he ripeness doctrine is primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy." (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170 [188 Cal.Rptr. 104, 655 P.2d 306].)

■ Consistent with the ripeness doctrine, section 1126, subdivision (b) applies to "[a]ny party *aggrieved* by any decision or order . . . ." (Italics added.) In other words, where an agency applies regulations to a party's injury, a sufficient controversy exists to satisfy the ripeness requirement. (*Coral Construction, Inc. v. City and County of San Francisco* (2004) 116 Cal.App.4th 6, 26 [10 Cal.Rptr.3d 65] [specific application of the challenged ordinance to a bid submitted by construction company was sufficient "injury"].) Here, plaintiffs were aggrieved by the inclusion of Term 91 in their permits and licenses because it gave the SWRCB the authority to order curtailment of water diversions for additional periods based on real-time assessment of water availability.

## B.  *Challenge to Issuance of Curtailment Notices*

Plaintiffs contend they were not required to raise their challenge to the implementation of Term 91 at the time the curtailment notices were issued because the notices were "merely notices of potential future violations." Citing *Western Surgical Supply Co. v. Affleck* (1952) 110 Cal.App.2d 388 [242 P.2d 929] (*Western Surgical*), they argue that mere notice of violation does not constitute an agency's enforcement of an order giving rise to a mandate proceeding. Plaintiffs assert, "it was not until approximately a year

---

[11] In any event, plaintiffs' failure to refer to the O'Hagan declaration in their opening brief waives any challenge to the sufficiency of the evidence to support the court's factual findings. (*SWRCB Cases, supra,* 136 Cal.App.4th at p. 749.)

to two years subsequent to these notices that [plaintiffs] were for the first time put on notice of, and charged with, an actual violation of Term 91."

Plaintiffs' lack of notice argument ignores the unequivocal language of the curtailment notices which informed plaintiffs that they "MUST IMMEDI-ATELY DISCONTINUE WATER DIVERSION UNDER THE SPECIFIED APPROPRIATIVE WATER RIGHT FROM THE DATE OF RECEIPT OF THIS NOTICE THROUGH AUGUST 31, 2000, UNLESS NOTIFIED EAR-LIER." We conclude plaintiffs were clearly "aggrieved" by the curtailment notice within the meaning of section 1126, subdivision (b) because it required plaintiffs to *immediately* discontinue diversion of water under their licenses. Implementation of Term 91 was ripe for challenge upon plaintiffs' receipt of the curtailment notices in June 2000.

Plaintiffs' reliance on *Western Surgical* is misplaced. In that case, a wholesale distributor of drugs and medical supplies filed a petition for writ of mandate to restrain the California State Board of Pharmacy from enforcing certain regulations and orders at a time when misdemeanor criminal complaints were pending in connection with the same violations. However, the Board of Pharmacy had taken no action to enforce the administrative notices of violations. (*Western Surgical, supra,* 110 Cal.App.2d at pp. 389–390.) The court denied the petition on grounds there was nothing to review (*id.* at p. 391) and "a determination as to the validity of the statutes involved would amount to an unwarranted interference with the criminal proceedings now pending in the municipal courts" (*id.* at p. 393). Here, there were no pending proceedings, criminal or otherwise, to delay enforcement of Term 91 upon notice of curtailment.

■ Next, we reject plaintiffs' claim that Code of Civil Procedure section 1094.5[12] is inapplicable to judicial review of the curtailment notices because Water Code section 1123[13] authorizes, but does not mandate, the SWRCB to hold a hearing on a petition for reconsideration of SWRCB action. Section 1126, subdivision (c) states that, "[s]ection 1094.5 of the Code of Civil Procedure *shall* govern judicial proceedings under this section." (Italics

---

[12] Code of Civil Procedure section 1094.5, subdivision (a) reads in relevant part: "Where the writ is issued for the purpose of inquiring into the validity of any final administrative order or decision made as the result of a proceeding *in which by law a hearing is required to be given,* evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer, the case shall be heard by the court sitting without a jury." (Italics added.)

[13] Section 1123 provides: "The decision or order may be reconsidered by the board on all the pertinent parts of the record and such argument as may be permitted, or a further hearing may be held, upon notice to all interested persons, for the purpose of receiving such additional evidence as the board may, for cause, allow. The decision or order on reconsideration shall have the same force and effect as an original order or decision."

added.) This language read in conjunction with section 1126, subdivision (a) ("It is the intent of the Legislature that all issues relating to state water law decided by the board be reviewed in state courts . . . ."), indicates the Legislature's intent that Code of Civil Procedure section 1094.5 govern judicial review of all cases relating to state water law. Nothing in subdivision (b) of section 1126 limits the type of proceeding subject to judicial review. We therefore conclude that judicial review is not limited to "proceeding[s] in which by law a hearing is required." (Code. Civ. Proc., § 1094.5, subd. (a).)

Plaintiffs offer no support for their argument that the curtailment notices do not constitute a "final action" by the SWRCB and therefore are not subject to judicial review. As we stated, the notices are unequivocal in directing plaintiffs to immediately stop diverting water pursuant to Term 91. Section 1126, subdivision (b) provides judicial review for "[a]ny party aggrieved by *any* decision or order . . . ." (Italics added.) Plaintiffs' exhaustion of remedies argument is irrelevant because the SWRCB does not challenge plaintiffs' petition on that ground.

■ Finally, plaintiffs argue that even if their challenges to implementation of Term 91 are barred under section 1126, subdivision (b), the issues are "ripe for declaratory relief." Section 1126, subdivision (d) states that failure to file a timely writ of mandate means that the challenged order is "not subject to review by any court." Where, as here, the Legislature has designated a remedy by which to review an administrative action, declaratory relief is unavailable. (*County of Los Angeles v. State Water Resources Control Bd.* (2006) 143 Cal.App.4th 985, 1002 [50 Cal.Rptr.3d 619].)

C. *The Merits of Plaintiffs' Term 91 Claims*

Having concluded plaintiffs' challenges to Term 91 are time-barred, we also explain why there is no merit in plaintiffs' substantive claims as a matter of law.

1. *Water Quality Findings*

Plaintiffs argue that before imposing the Term 91 curtailments, the SWRCB was required to make an express finding that plaintiffs' diversions would cause the Projects to release storage water to offset the impact of plaintiffs' diversions on water quality in the Delta. Plaintiffs also maintain that imposition of Term 91 was not warranted because "reclamation and farming of [plaintiffs'] lands [by plaintiffs and their predecessors] . . . actually resulted in substantial water savings to the Projects."

Before the adoption of Term 91, as an interim measure in 1978, the SWRCB did not attempt to regulate permittees' season of diversion on a

real-time basis. As late as 1983, it simply excluded the months of July and August from the season of diversion in all Term 80 permits. "In some areas, the Board excluded additional periods of time where necessary for protection of local prior rights, fish flow requirements and other restrictions imposed by adjudications." (Decision 1594, *supra*, at p. 25.) There is no indication the SWRCB conditioned imposition of this two-month curtailment on whether diversion by a particular permittee might impact "local prior rights, fish flow requirements and other restrictions . . . ." (*Ibid.*)

In Decision 1594, the SWRCB concluded that it was appropriate for Term 80 permittees to *share* responsibility with the Projects "in meeting all Delta water quality standards whether based on protection of agricultural uses, municipal and industrial uses, or fish and wildlife and other public interest requirements." (Decision 1594, *supra*, at pp. 9, 35.) It also found that "[d]ue to the wide variation in water availability from year to year, a real-time procedure [such as that provided by Term 91] allow[ed] for more efficient utilization of water supplies when they [were] available and better protection of prior rights when water supplies [were] scarce." (*Id.* at p. 12; see *id.* at pp. 22, 24.) Balancing the need for efficient administration with the policy of shared responsibility, the SWRCB found that it was "inefficient to establish real-time regulation of hundreds of parties diverting small quantities of water" and applied the Term 91 method of determining water availability "only to those Term 80 permits which authorize[d] direct diversion at a rate of 1.0 cfs or more or which authorize[d] diversion to storage of 100 AF per year or more."[14] (Decision 1594, *supra*, at p. 27.) Nothing in Decision 1594 or Order WR 84-2 suggests the SWRCB intended to condition imposition of Term 91 on the possible impact of a particular permittee's or licensee's diversion on water quality during the curtailment period. Indeed, such a procedure appears contrary to real-time calculation of available water. In any event, we will not read a causation requirement into the Term 91 narrative formula or mathematical equations in the absence of a showing that the SWRCB so intended.

## 2. *Rights Under the Watershed Protection Act (WPA)*

Plaintiffs argue that Term 91 deprived them of their right to use water from their own watershed, that is, the Delta, in violation of section 11460. They also assert that they were not required to pay the Projects for water in order to exercise their rights under the WPA. Plaintiffs' arguments conflict with well-established principles of water rights law.

---

[14] The SWRCB determined that 61 out of 160 total Term 80 permittees with a direct diversion rate of 1.0 cfs or more accounted for 97 percent of the water diverted; and 25 out of 382 total Term 80 permits for storage demand of 100 AF or more accounted for 93 percent of the stored water. (Decision 1594, *supra*, at p. 26.)

At the same time that the Legislature established the CVP in 1933, it enacted a provision which later became known as the Watershed Protection Act (§§ 11460–11463). (*El Dorado Irrigation Dist. v. State Water Resources Control Bd.* (2006) 142 Cal.App.4th 937, 947 [48 Cal.Rptr.3d 468] (*El Dorado*); *United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82 [138, 227 Cal.Rptr. 161].) Section 11460 provides: "In the construction and operation by the department of any project under the provisions of this part a watershed or area wherein water originates, or an area immediately adjacent thereto which can conveniently be supplied with water therefrom, shall not be deprived by the department directly or indirectly of the prior right to all of the water reasonably required to adequately supply the beneficial needs of the watershed, area, or any of the inhabitants or property owners therein." Section 11460 applies to the operation of the SWP by the DWR and the operation of the CVP by the USBR. (§§ 2, 11128; *United States v. State Water Resources Control Bd., supra,* at pp. 138–139; see also *El Dorado, supra,* at p. 976; *SWRCB Cases, supra,* 136 Cal.App.4th at p. 758.)

Order WRO 2004-0004, the SWRCB decision at issue here, described the impact of Term 91 on water right permittees and licensees when the Projects store and release water. "Term 91 is based on the assumption that the water rights of the DWR and the USBR to appropriate uncontrolled flows for export from the southern Delta are junior to all other water rights in the watershed. The water stored upstream by the DWR and the USBR during periods of excess flow, however, is appropriated at times when its appropriation does not injure any other water right holders. *When this water is subsequently released from the reservoirs to flow downstream to the export facilities, it is already appropriated, and is not naturally present in the rivers. Water that is appropriated and is flowing in a channel under the control of its appropriator is not subject to appropriation by others.* [Citations.] *Accordingly, the stored water transported through the rivers to the export pumps by the projects is not available for others to appropriate. It also is not available to riparian right holders, since it is not natural flow.*" (Order WRO 2004-0004 at p. 5, italics added.)

We affirmed this reading of the WPA in *El Dorado, supra,* 142 Cal.App.4th at page 976, which involved a challenge to the SWRCB's inclusion of Term 91 in the irrigation district's permit to appropriate water from the South Fork of the American River. We explained that "although [the irrigation district] may be entitled to assert a priority under section 11460 over the [USBR] and the [DWR] to the diversion of water originating in the watershed of the South Fork of the American River, that priority does *not* extend to water the projects have properly diverted to storage at an earlier date. If [the irrigation district] wants water properly stored by the projects, it must pay for it." (*Id.* at p. 976.) Although we affirmed the trial court's judgment against the SWRCB

on the ground that its inclusion of Term 91 in the irrigation district's permit violated the rule of priority, we expressly held that the "area of origin statutes did not justify the trial court's decision" to invalidate the inclusion of Term 91 in the permit. (*Ibid.*)

The SWRCB's interpretation of the impact of Term 91 on diversion of already appropriated water is consistent with section 11462, which provides that "[t]he provisions of [the WPA] shall not be so construed as to create any new property rights other than against the department as provided in this part *or to require the department to furnish to any person without adequate compensation therefor any water made available by the construction of any works by the department.*" (Italics added.)

Plaintiffs maintain that under the WPA, the SWRCB should not authorize Term 91 diversion curtailments when Projects' activity is responsible for degrading water quality. Plaintiffs contend that the SWRCB should authorize diversion curtailments only where plaintiffs' diversions affect water quality. They argue that "[t]o the extent the Delta water quality standards would still be impaired even if the Projects halted all of their operations and removed all constructed works which impair those standards, then the [SWRCB] would next have to quantify how much impairment of those standards is caused by [plaintiffs'] diversions made during those curtailment periods. [¶] Once the foregoing [was] quantified, the [SWRCB] would then have to quantify how much stored water the Projects . . . must release to offset [plaintiffs'] impairment of those standards." This court already rejected this claim in the context of stored water releases from the New Melones reservoir for the purpose of meeting downstream water quality objectives: "Section 11460 is not concerned with *why* a particular beneficial need for water exists within the area of origin. For example, it does not matter why there is excess salinity at Vernalis or why there is reduced outflow from the Delta. What matters is that these conditions exist, they have adverse impacts on beneficial uses of water in the Delta, and releases from New Melones can be used to mitigate those impacts. To the extent water from New Melones is being used for those purposes, it is being used to supply the beneficial needs of the area of origin, and the San Joaquin County parties cannot assert any priority to that water under section 11460 for their consumptive use of the water. Even if more New Melones water might be available for consumptive use by the San Joaquin County parties if the [USBR] found other ways to mitigate the adverse impacts of exports on the Delta, that does not mean the [USBR] is violating section 11460 by using New Melones water to mitigate those impacts." (*SWRCB Cases, supra,* 136 Cal.App.4th at pp. 759–760, fn. omitted.)

Based on the foregoing authority, we conclude that the WPA does not bar enforcement of Term 91 against plaintiffs.

### 3. *Rights Under the Delta Protection Act:*

Plaintiffs argue that implementation of Term 91 deprived them of their rights under the DPA to divert Delta water. They maintain that the Projects have a statutory duty under section 12202 to provide for salinity control and an adequate water supply in the Delta without compensation by plaintiffs. Contrary to plaintiffs' argument, nothing in the language of the DPA gives plaintiffs a new right to divert water in the Delta or entitlement to Projects' water without paying for it.

Sections 12200 through 12205 are commonly known as the DPA. (*SWRCB Cases, supra,* 136 Cal.App.4th at p. 767.) Section 12201 sets forth the Legislature's dual goals in maintaining (1) " 'an adequate water supply in the Delta sufficient to maintain and expand agriculture, industry, urban, and recreational development in the Delta' "; and (2) " 'a common source of fresh water for export to areas of water deficiency' " necessary to the peace, health, safety and welfare of the people of the state. (*SWRCB Cases, supra,* at p. 767.) The DPA gives preference to the first goal of salinity control by providing that "no one may divert water from the Delta that is necessary for salinity control or to provide an adequate water supply for users within the Delta." (*Id.* at p. 768; see §§ 12202, 12203, 12204.)

The SWRCB explained in the challenged Order WRO 2004-0004 that "[n]o provision in the Delta Protection Act accords a water right to users of water in the Delta. . . . [Plaintiffs] must have adequate existing water rights, acquired under the laws that govern acquisition of water rights, before they can divert and use water from the channels of the Delta. If existing water rights are not adequate to supply the needs of in-Delta water users, the Delta Protection Act does not ensure the Delta water users an adequate supply. The in-Delta water users can, however, make arrangements with [the] DWR and pay adequate compensation to the DWR for the water, pursuant to Water Code section 11462." (Order WRO 2004-0004, *supra,* at p. 20.) The SWRCB continued: "Stored water that DWR releases into the Delta when Term 91 *is in effect is water made available by the construction of DWR's Oroville Reservoir.* Accordingly, if the Delta water users adequately compensate DWR, they can take water attributable to DWR's storage releases from the Delta when Term 91 is in effect." (*Id.* at p. 21, italics added.)

We begin by rejecting plaintiffs' argument that the Projects are under a statutory mandate to provide them with Delta water without compensation. Section 12202 reads in relevant part: "*Among the functions to be provided* by the State Water Resources Development System, in coordination with the activities of the United States in providing salinity control for the Delta through operation of the Federal Central Valley Project, *shall be* the provision

of salinity control and an adequate water supply for the users of water in the Sacramento-San Joaquin Delta. If it is determined to be in the public interest to provide a substitute water supply to the users in said Delta in lieu of that which would be provided as a result of salinity control no added financial burden shall be placed upon said Delta water users solely by virtue of such substitution." (Italics added.) Read in its entirety, providing salinity control and an adequate water supply are "among the functions" of the SWP under section 12202. There is nothing in the language of the DPA to require the SWP to serve all the functions in any given situation. We recognized in the *SWRCB Cases* that the DPA serves dual goals and must, "in the first instance[,] . . . balance 'in-Delta needs and export needs.' " (*SWRCB Cases, supra*, 136 Cal.App.4th at pp. 768, 770.)

■ In the *SWRCB Cases,* we also affirmed the SWRCB's legal conclusion that the DPA creates no new and separate water right to users of water in the Delta by stating that, "[n]othing in the Delta Protection Act purports to grant any kind of water right to any particular party." (*SWRCB Cases, supra,* 136 Cal.App.4th at pp. 771–772.) Thus, the SWRCB properly concluded in Order WRO 2004-0004 that plaintiffs "must have adequate existing water rights, *acquired under the laws that govern acquisition of water rights,* before they can divert and use water from the channels of the Delta. If existing water rights are not adequate to supply the needs of in-Delta water users, the Delta Protection Act does not ensure the Delta water users an adequate supply." (Order WRO 2004-0004, *supra,* at p. 20, italics added.)

### 4. *"First in Time" Rights of Seniority*

Citing *El Dorado,* plaintiffs argue implementation of Term 91 deprived them of their "first in time, first in right" appropriative rights against water rights held by the Projects. They note that the USBR holds a permit issued on application 27319 which is junior to all four of plaintiffs' permits and authorizes direct diversion of 4,000 cfs from the Stanislaus River for hydropower generation any day of the year. (*In re Petition for Assignment of Application 14858* SWRCB Dec. No. 1616 (Jan. 21, 1988) pp. 4, 36, 37.) In addition, plaintiffs state that the USBR holds water rights permit Nos. 16211, 16212 and 15735 which are junior to licenses held by the Phelpses and authorize diversion for hydropower as well as other uses. (Decision 1485, *supra,* table I, at p. 36.) Without citing evidence in the record, plaintiffs maintain that the USBR's use of these junior permits "could result in" or "creates the potential" for taking water away from the river systems to which the Phelpses and other plaintiffs have a prior right. There is no merit in this argument.

■ In *El Dorado,* we held that the SWRCB abused its discretion and violated the "rule of priority" by imposing Term 91 on the irrigation district's

water right permit and failing to impose it on other, more junior appropriators in the watershed. (*El Dorado, supra,* 142 Cal.App.4th at p. 943.) In other words, should the SWRCB have applied Term 91 to all the permittees and licensees entitled to appropriate the water available for appropriation? We described how the rule of priority functions under a dual system of water rights that recognizes the doctrine of riparian rights and appropriative rights. (*Id.* at p. 961.) With respect to appropriative rights, " 'as between appropriators, the rule of priority is "first in time, first in right." [Citation.] The senior appropriator is entitled to fulfill his needs before a junior appropriator is entitled to use any water.' " (*Ibid.,* quoting *United States v. State Water Resources Control Bd., supra,* 182 Cal.App.3d at pp. 101–102.) Based on the rule of priority, we concluded the SWRCB abused its discretion by imposing Term 91 on the irrigation district and not the more junior appropriators. Plaintiffs do not contend in this case that there are other, non-Projects appropriators in the watershed that are capable of diverting water during the Term 91 curtailment period.

We also made clear in *El Dorado* that "the rule of priority *applies only to the use of natural or abandoned flows* in a watercourse. No riparian or appropriator has a right to use water that was previously stored or imported by another upstream and then released into the watercourse for use . . . ." (*El Dorado, supra,* 142 Cal.App.4th at p. 962, italics added.) Under its express language, Term 91 applies to curtail diversion of permittees and licensees only when the natural flow is insufficient to meet Delta water quality standards and the Projects are required to release stored or imported water to meet those objectives. None of plaintiffs' permits entitled them to divert stored water or imported water.

### 5. *Water Quality Standards*

Finally, plaintiffs contend that the SWRCB abused its discretion in basing implementation of Term 91 on water quality objectives set forth in *In re Implementation of Water Quality Objectives for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary,* SWRCB Dec. No. 1641 (Dec. 29, 1999) (Decision 1641) rather than those required under Decision 1485, adopted in 1978. The newer standards increased the amount of water required. Plaintiffs concede that the SWRCB has discretion to modify all aspects of Term 91, but argue that "the issue is whether it can do so in a manner that deprives [plaintiffs] (and other water right holders subjected to Term 91) [of] the right to use water pursuant to their licenses without affording them 'some form of notice and a hearing' " before issuing the curtailment notices.

Although we disagree with plaintiffs that the director has broad discretion in the implementation of Term 91,[15] we conclude there is nothing in the Term 91 narrative formula that prevents the SWRCB from using the only valid, up-to-date measure of water quality available in order to protect the beneficial use of the Delta. The court's 1986 decision in *United States v. State Water Resources Control Bd., supra*, 182 Cal.App.3d 82, invalidated the water quality standards set forth in Decision 1485. Rather than remand the case, the court allowed the SWRCB to continue proceedings already under way to establish new water quality objectives that were implemented under Decision 1641 in 1999. (182 Cal.App.3d at pp. 97–98, 120–121; Decision 1641, *supra*, at p. 180.) Plaintiffs had ample notice that the water quality standards set forth in Decision 1485 were inapplicable.

## III.

### *The Remainder of the Court's Findings Are Supported by Substantial Evidence*

Plaintiffs state in the introduction to their opening brief: "Although [plaintiffs] and their predecessors have been diverting water onto these same lands for irrigation since the 1850's and 1870's pursuant to what was thought and recognized to be pre-1914, riparian and overlying water rights, in an effort to further protect the rights to divert they filed applications for post-1914 appropriative water rights from the SWRCB in the 1960's." This statement is misleading in light of the evidence. Plaintiffs cite no evidence to support the claim they filed permit applications to "further protect" recognized pre-1914, riparian and overlying water rights. More importantly, the record does not support plaintiffs' claim to water rights in addition to those granted by the SWRCB in their permits and licenses.

### A. *The Court's Factual Findings*

The trial court made the following factual findings in support of its denial of plaintiffs' petition/complaint:

1. Plaintiffs' claim that the SWRCB was estopped from enforcing Term 91 against them "is undermined by the admonitions of [the SWRCB's] staff during the 2000 Term 91 curtailment period that [plaintiffs] would have to prove the existence of their previously assumed riparian rights or potentially face civil penalties for diversions during the curtailment period."

2. "At best, the evidence is speculative and inconclusive as to whether [plaintiffs'] parcels retained riparian rights after their conveyance and whether any such retained rights were preserved by continuous use thereafter."

---

[15] See discussion at pages 101–103, *ante*.

3. Plaintiffs "do not overcome the lack of solid, credible evidence to establish retained and preserved riparian rights by their assertion of a riparian rights theory" based on the connection between groundwater and surface water.

4. "The evidence . . . does not establish an essential element of a pre-1914 right to appropriate water: the actual appropriation of water from the San Joaquin or Middle Rivers before 1914 for the irrigation of [plaintiffs'] parcels on Upper Roberts Island."

In light of the principles governing appellate review, we conclude the court's findings are supported by substantial evidence. (*Bancroft-Whitney Co. v. McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157] (*Bancroft-Whitney*); *Hall, supra*, 98 Cal.App.4th at p. 637.)

B. *Estoppel*

Plaintiffs argue that the SWRCB was estopped from enforcing Term 91 against them "given the specific and repeated written assertions . . . previously made by the [SWRCB's] staff that [plaintiffs] indeed had riparian rights which would supply their needs during times when Term 91 might be in effect." Plaintiffs cite in support of their argument the following statements— mostly handwritten notes—contained in various inspection reports and license checks prepared by SWRCB staff between 1984 and 1997.

*Relating to Plaintiff Ratto*

"When term 91 is implemented, applicant may use riparian right since project is in Delta lowlands." ("Check for Permit" dated Dec. 4, 1984.)

"Applicant has provided assurance of supplemental water supply during summer. Riparian right." ("Check for Permit" dated Dec. 4, 1984.)

"Other Rights, Riparian—Delta Lowlands." ("Report of Inspection" dated Sept. 13, 1994.)

"Therefore we are apparently accepting the claims of riparian rights pending any adjudication in the area. . . . [¶] . . . [¶] I left a message on the Ratto's answering machine concerning the alternate water supply by use of claim of riparian right during the Term 91 curtailment period." ("Contact Report" dated July 9, 1997.)

*Relating to Plaintiff Phelps*

"They have no alternate source of water, however, because of their location in the 'Delta Lowlands' their claim of riparian rights appears to be valid.

Thus, they can divert under riparian right as long as natural runoff is flowing in the Middle River." ("Report of Inspection" dated May 19, 1988.)

"The place of use can be said to be riparian to the source since it is located on Roberts Island in the Delta." ("Report of Inspection" dated June 2, 1988.)

"Believe inspection report should better explain A) Located on Roberts Island in Delta, can claim riparian. Why no alternate supply is necessary for periods when Term 91 cuts off diversions under this permit." ("Check for License" dated May 15, 1996.)

*Relating to Plaintiff Conn*

"Other Rights Riparian—Within Delta Lowlands." ("Report of Inspection" dated Apr. 26, 1996.)

■ The long-established doctrine of equitable estoppel is based on "foundation of conscience and fair dealing." (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 488 [91 Cal.Rptr. 23, 476 P.2d 423] (*Mansell*).) The Supreme Court expressed the doctrine in its classic form: "The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both.' " (*Seymour v. Oelrichs* (1909) 156 Cal. 782, 795 [106 P. 88] disapproved on another ground in *Sterling v. Taylor* (2007) 40 Cal.4th 757, 769 [55 Cal.Rptr.3d 116, 152 P.3d 420].)

■ Estoppel may be applied against the government " 'where justice and right require it.' " (*Mansell, supra*, 3 Cal.3d at p. 493.) However, courts will not apply estoppel to a public agency "if the result will be the frustration of a strong public policy." (*Bib'le v. Committee of Bar Examiners* (1980) 26 Cal.3d 548, 553 [162 Cal.Rptr. 426, 606 P.2d 733].) Public policy must be considered where a party raises estoppel to prevent enforcement of environmental statutes. (See *People ex rel. State Air Resources Bd. v. Wilmshurst* (1999) 68 Cal.App.4th 1332, 1347 [81 Cal.Rptr.2d 221] [air quality]; and *Raley v. California Tahoe Regional Planning Agency* (1977) 68 Cal.App.3d 965, 975–976 [137 Cal.Rptr. 699] [land use].)

Based on these principles, *Mansell* and its progeny describe the two-part inquiry involved in determining whether estoppel is proved: "First, a court must determine whether the traditional elements necessary for assertion of an estoppel against a private party are present. These elements include the following: '(1) The party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.' [Citation.] Second, the court must weigh the equities and consider the impact on public policy of permitting an estoppel in a given case. The existence of an estoppel is a factual question [citation] . . . ." (*J.H. McKnight Ranch, Inc. v. Franchise Tax Bd.* (2003) 110 Cal.App.4th 978, 991 [2 Cal.Rptr.3d 339] (*McKnight Ranch*); see *Mansell, supra,* 3 Cal.3d at p. 489.) We conclude there is substantial evidence to support the trial court's finding that plaintiffs failed to establish the element of reliance.

First, the cited comments reflect staff assumptions based on the fact plaintiffs' land is located in the "Delta Lowlands" on Roberts Island.[16] One comment refers to the "claims of riparian rights." There is no indication in the various contact reports and inspection reports that plaintiffs' claimed riparian rights had ever been adjudicated.

Second, case law is clear that unauthorized legal representations by agency staff cannot provide the basis for estoppel against the agency. (*Illinois Commercial Men's Assn. v. State Bd. of Equalization* (1983) 34 Cal.3d 839, 855–856 [196 Cal.Rptr. 198, 671 P.2d 349]; *Pipe Trades Dist. Council No. 51 v. Aubry* (1996) 41 Cal.App.4th 1457, 1474 [49 Cal.Rptr.2d 208]; *Cal. Horse Racing Bd. v. L. A. Turf Club* (1952) 111 Cal.App.2d 933, 939 [245 P.2d 327].) In *Hampson v. Superior Court* (1977) 67 Cal.App.3d 472 [136 Cal.Rptr. 722], the petitioners filed a petition for writ of mandate challenging a regional water quality control board's denial of their request for an exemption from a waste discharge prohibition included in a water quality control plan. (*Id.* at pp. 483–484.) The petitioners alleged that they had secured an agreement from the executive officer of the regional board authorizing their exemption from the prohibition. They also alleged that the agreement estopped the regional board from later denying the exemption. The appellate court ruled that the executive officer lacked the authority to make a binding agreement regarding an exemption, and " '[a]ny person dealing with a state agency is

---

[16] The references to "Delta Lowlands" and riparian rights are found in a 1956 study prepared by the USBR and used by the SWRCB and Projects to estimate water availability. The SWRCB noted in Order WRO 2004-0004 that "[a]gencies other than the SWRCB made the assumptions in the reports, and they did not make the assumptions for the purpose of determining actual water rights, but instead for estimating water use." The SWRCB concluded that the reports "do not provide evidentiary support for an estoppel argument." We agree with that assessment.

chargeable with knowledge of all of the powers possessed or which may be legally exercised by the officers in charge of such agency . . . .' " (*Id.* at p. 483.) Here, plaintiffs fail to show that the SWRCB granted staff members the authority to make definitive determinations regarding riparian rights.

Third, even if we were to conclude plaintiffs were entitled to rely on the staff comments which suggested plaintiffs held riparian rights, which we do not, the SWRCB notified plaintiffs in 2000 and 2001 that it questioned their riparian claims. Plaintiffs were informed that the SWRCB would likely require proof of the right, including results of a title search.

Finally, we will not second-guess the court's weighing of the equities, including public policy considerations, in its rejection of plaintiffs' estoppel claim. (*McKnight Ranch, supra,* 110 Cal.App.4th at p. 991.) Decision 1594 outlines the history of the SWRCB's efforts to protect water quality in the Delta. Term 91 linked the availability of water for permittees and licensees with Delta water quality standards, and reflected SWRCB policy that diverters of water should share responsibility for meeting those standards.

C. *Riparian Rights*

Plaintiffs argue on appeal that they were entitled to divert water during the 2000 and 2001 Term 91 curtailment periods because they held riparian rights apart from water rights granted in their permits and licenses. They maintain that the trial court's rejection of their claim to riparian rights is contrary to the law and the evidence.

"The riparian doctrine confers upon the owner of land contiguous to a watercourse the right to the reasonable and beneficial use of water on his land." (*People v. Shirokow* (1980) 26 Cal.3d 301, 307 [162 Cal.Rptr. 30, 605 P.2d 859].) The extent of lands having riparian status is determined by three criteria: (1) the land is contiguous to or abuts the stream; (2) the parcel is the smallest parcel held under one title in the chain of title leading to the current owner; and (3) the parcel is within the watershed of the stream. (*Rancho Santa Margarita v. Vail* (1938) 11 Cal.2d 501, 528–529 [81 P.2d 533].) "[W]here the owner of a riparian tract conveys away a noncontiguous portion of the tract by a deed that is silent as to riparian rights, the conveyed parcel is forever deprived of its riparian status." (*Id.* at p. 538, citing *Anaheim Union Water Co. v. Fuller* (1907) 150 Cal. 327, 331 [88 P. 978].) In deciding whether a parcel is riparian, the court looks to evidence of the present natural topography, not past geological conditions. (*Rancho Santa Margarita v. Vail, supra,* at pp. 548–549.)

Here, the evidence is uncontradicted that none of plaintiffs' parcels currently abuts a natural watercourse because each connection with the San

Joaquin or Middle Rivers was severed when the parcels were conveyed in the 1870's or 1890's. Moreover, plaintiffs do not contest the SWRCB finding that the deeds "[did] not address access" to the watercourses, that is, they were silent as to whether the noncontiguous land retained its riparian status after the transfers. Indeed, plaintiffs' counsel conceded at the hearing on plaintiffs' petition/complaint that the issue was "the evidence other than language in the deed[s] because there [was] no language in the deed[s]" to show they retained riparian rights in parcels that no longer abut natural watercourses.

In the face of the foregoing evidence, plaintiffs took three different approaches in their effort to prove they held riparian rights. First, plaintiffs argued that there was a hydrologic connection between water in the underground strata of their land and the surface waters in the river channels which gave rise to riparian and/or overlying rights to divert surface waters. (See *Hudson v. Dailey* (1909) 156 Cal. 617, 626–627 [105 P. 748] (*Hudson*).) Second, if the court found that connection between the water in the underground strata and the surface waters was not immediate enough to create a riparian right, plaintiffs maintained that they had a right to draw from the common underground supply of percolating water. (See *id.* at p. 628.) Third, plaintiffs asserted that extrinsic evidence showed that plaintiffs and their predecessors in interest intended to retain their riparian rights when they acquired the noncontiguous parcels. (See *id.* at pp. 624–625.)

In *Hudson*, the plaintiff was a landowner who claimed riparian rights in a stream directly supplied by saturated soils and gravels in the valley through which the San Jose Creek ran. (*Hudson, supra*, 156 Cal. at p. 620.) She also argued that the underground water consisted of percolating water to which she had a right separate from her riparian claim. (*Id.* at p. 627.) The plaintiff filed a complaint alleging that the defendants bored wells and unlawfully deprived her of water from the underground stream. The plaintiff sought to quiet title in her riparian rights and to enjoin the defendants from pumping water from the wells to the extent it prevented her from obtaining a sufficient quantity of water. The trial court ruled for the defendants and the plaintiff appealed. The Supreme Court concluded the evidence supported the trial court judgment. (*Id.* at pp. 620–621.) Even if we were to accept that the theories described in *Hudson* apply in the case before us, we conclude the record supports the court's rejection of plaintiffs' claims.

Plaintiffs' expert, Chris Neudeck, gave lengthy testimony interpreting maps, photographs and drawings which plaintiffs claimed showed the connection between underground strata and surface watercourses, the existence of percolating water, and plaintiffs' intent to retain the ability to divert water from various channels after severance. Neudeck also relied on a declaration prepared by Peter Ohm, a purported eyewitness to water diversions through

terra cotta pipe on the Conn property. However, given the undisputed dates of the deeds of conveyance, it is unlikely Ohm had personal knowledge of the facts to which he testified by declaration. The SWRCB's evidence, including its expert Nick Wilcox's interpretation of maps, photographs and drawings, contradicted Neudeck's testimony in important respects.

The court gave detailed reasons for rejecting plaintiffs' evidence. Where evidence is in conflict, we must resolve the conflict in favor of the trial court's finding. (*Bancroft-Whitney, supra,* 166 Cal. at p. 142; see 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 359, pp. 408–410.)

### D. *Pre-1914 Appropriative Rights*

Next, plaintiffs assert that there is insufficient evidence to support the court's finding that plaintiffs did not hold pre-1914 appropriative rights. Once again, we must uphold the trial court's finding based on the rule of conflicting evidence. (*Bancroft-Whitney, supra,* 166 Cal. at p. 142.)

"Appropriative rights initiated prior to the 1913 amendment [to the Water Commission Act] . . . are commonly referred to as 'pre-1914 rights.'" (*People v. Murrison* (2002) 101 Cal.App.4th 349, 359, fn. 6 [124 Cal.Rptr.2d 68].) The court compared riparian and pre-1914 appropriative water rights in *Pleasant Valley Canal Co. v. Borror* (1998) 61 Cal.App.4th 742, 752–753 [72 Cal.Rptr.2d 1]: "Under common law principles, riparian owners shared with one another a right to the entire natural flow of the stream running through their properties. That is, they were entitled to proportional shares of the water depending upon how much each was then applying to a reasonable beneficial use. The right protected prospective uses as well, so their respective entitlements might change as their uses changed. They were, however, required to use the water on their riparian land. Appropriators, on the other hand, were entitled to use only as much water as they could put to a reasonable beneficial use, and only then to the extent their use did not interfere with the rights of riparians or senior appropriators. The right could be lost by disuse but could not be expanded except by a new appropriation. Unlike riparian rights, appropriative rights were not tied to the land; appropriated water could be put to a different use or used at another location if that could be done without injury to others. [Citation.] Most importantly, although riparians were limited to reasonable uses among themselves, there was no such restriction on their

right relative to appropriators; they were entitled to the full flow of the stream even if the uses to which they were putting the water were unreasonable or wasteful. [Citations.]"

In this case, the trial court found that plaintiffs failed to establish actual appropriation of water for irrigation before 1914. As we already explained, Neudeck and Wilcox gave conflicting interpretations of the maps, photographs and drawings submitted into evidence. Specifically, they disagreed on the extent of pre-1914 irrigation on upper Roberts Island, the reach of the sloughs, the extent of dry farming and the use of grain crops.

### E.   Calculation of Civil Penalties

Plaintiffs contend that the SWRCB failed to consider two of the mandatory factors set forth in section 1055.3 when it set the amount of civil penalties to be assessed against plaintiffs. They also argue the SWRCB should be estopped from levying the amounts sought in the order because two inspection reports issued in 2000 listed the potential penalty as $500 *per year*, rather than $500 per day. The trial court found that the SWRCB "adequately and reasonably considered all the circumstances relevant to the amounts of civil liability imposed on [plaintiffs] in Order WRO 2004-0004."

Section 1055.3 provides: "In determining the amount of civil liability, the board shall take into consideration all relevant circumstances, including, but not limited to, the extent of harm caused by the violation, the nature and persistence of the violation, the length of time over which the violation occurs, and the corrective action, if any, taken by the violator."

After citing the factors set forth in section 1055.3, the SWRCB found in Order WRO 2004-0004 that plaintiffs committed a trespass in violation of section 1052, subdivision (a); that plaintiffs' illegal diversion of water resulted in harm; and that plaintiffs continued to divert water illegally after they were specifically notified that the diversions must stop. As to each plaintiff, the SWRCB found that "[T]he liability should be a penalty high enough to take into consideration the market value of the water used by the crop, the costs to the SWRCB, and the effects on other water users and instream uses of water of diverting and using water without authorization."

We conclude the record supports the trial court's finding that the SWRCB properly considered all the relevant factors in imposing civil liability on plaintiffs.

## DISPOSITION

The judgment is affirmed. Respondents State Water Resources Control Board and the Department of Water Resources shall recover their costs on appeal. (Cal. Rules of Court, rule 8.276.)

Nicholson, Acting P. J., and Hull, J., concurred.

A petition for a rehearing was denied November 21, 2007, and appellants' petition for review by the Supreme Court was denied February 13, 2008, S159641.