Filed 5/7/20

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| MODESTO IRRIGATION DISTRICT, | C083430 |
| Plaintiff and Respondent, | (Super. Ct. No. 34-2011-00112886-CU-JR-GDS) |
| v. | |
| HEATHER ROBINSON TANAKA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Christopher E. Krueger, Judge. Reversed.

Freeman Firm, Thomas H. Keeling; Harris, Perisho & Ruiz, Mohan, Harris, Ruiz, Wortman, Perisho & Rubino, S. Dean Ruiz; Law Office of John Herrick, John Herrick; Nomellini, Grilli & McDaniel and Dante John Nomellini, Jr., for Defendant and Appellant.

Allen Matkins Leck Gamble Mallory & Natsis, James L. Meeder, Barry H. Epstein, Jordan L. Flanders; O'Laughlin & Paris and Valerie C. Kincaid for Plaintiff and Respondent.

1

California riparian rights principles, derived from English common law, hold that the owners of "riparian land," land that is contiguous to a river, stream, creek, lake or other natural water body, have the right to divert water from its source to use on the riparian land, a right known as a "usufructuary" right. (3 Miller & Starr, Cal. Real Estate (4th ed. 2019) § 9:29.)

"[A] riparian right, rather than being merely incident to or appurtenant to the land, has been said to be a vested right inherent in and a part of the land [citations] and passes by a grant of land to the grantee even though the instrument is silent concerning the riparian right." (*Murphy Slough Assn. v. Avila* (1972) 27 Cal.App.3d 649, 655-656 (*Murphy Slough*).) However, riparian rights can continue when riparian land is subdivided, creating subdivided parcels that are no longer contiguous to the water that rendered the larger parcel riparian. In the present case, appellant Heather Robinson Tanaka's great-grandfather purchased a subdivided parcel that had been part of a larger riparian tract but was no longer contiguous to water. Clearly, riparian rights can persist in land sold under such circumstances, though the grantee cannot acquire riparian rights any greater than those held by the grantor. The question in the case of such a transfer is whether the parties intended the grantee to receive riparian rights. The clearest expression of intent is when a deed expressly conveys the riparian rights to the noncontiguous parcel, in which case the parcel retains its riparian status. However, where the deed is ambiguous, extrinsic evidence is admissible on the question. Here, the trial court, after considering the language of the deed and extrinsic evidence, concluded the conveyance to Tanaka's great-grandfather did not convey riparian rights. As a consequence, Tanaka has no rights to divert water from Middle River onto her small, approximately 106-acre parcel that has been used for farmland for 130 years. We disagree with the trial court's conclusion and reverse.

2

# HISTORICAL SETTING

The events giving rise to this litigation began in the middle of the California Delta in the latter half of the 19th century before the islands were transformed from marsh and swampland into some of the most productive agricultural land in the state. The dispositive transaction occurred in 1890.

Before the 1850's, the islands in the San Joaquin Delta were regularly flooded. None of the land had been reclaimed. The largest island in the state, Roberts Island, consisted of 67,000 acres and was primarily marsh and swampland. Duck Slough was a large body of water that shifted in size and location depending on how much water was coming down the river at any time in any given year. The entire island at times was under water. Middle River breaks off from the San Joaquin River and flows along the western side of Roberts Island. On some 19th century maps, Duck Slough flowed almost all the way to Middle River. On others, they were connected.[1] The Sacramento River flowing south and the San Joaquin River flowing north meet in the Delta and flow out to San Francisco Bay to the Pacific Ocean.

The United States Congress encouraged the reclamation of swamplands throughout the country, although it was unwilling to commit the financial resources to accomplish the desired reclamation. In 1850 it passed the "Arkansas Act" to encourage reclamation and settlement by giving vast acreage to the states contingent upon the states devising programs to drain the marshland and let settlers move onto them to make them productive. (Act of Sept. 28, 1850, ch. 34, 9 Stat. 519-520.) Pursuant to this act, Congress gave California 2 million acres of federal swampland. California, however,

---

[1] Respondent Modesto Irrigation District's historian gave extensive testimony about the location of Duck Slough, its connection to Middle River, and whether it was used as a water conveyance to bring surface water into Roberts Island for irrigation. Because we do not need to reach the issues involving Duck Slough, the intricacies of his testimony about Duck Slough need not be recounted here.

imposed a 320-acre limitation and, therefore, only small reclamation projects initially were undertaken by small-scale farmers.  Individual settlers built small levees along the banks of the river and cultivated the back of these levees with fruits and vegetables.  Reclamation and farming began on Roberts Island in 1856.

In 1868 the state lifted the 320-acreage limitation allowing large corporations to attempt to reclaim the swamplands on a much larger scale.  Enter George Roberts, a speculator.  Roberts secured $12 million from powerful San Francisco and Oakland capitalists, accumulated nearly 250,000 acres of swampland at a price of 50 cents to $3 an acre, formed the Tide Land Reclamation Company, and attempted to reclaim Roberts Island.  But he encountered financial difficulties following massive flooding and decided reclamation was not as profitable as mining and speculating.  He sold hundreds of thousands of acres to Joel Parker Whitney in 1875 or 1876.

By then, irrigation was an essential part of reclamation.  In 1872 John Ross Browne wrote in the Transactions of the California State Agricultural Society, which in 1874 was published as an appendix to the Journal for the Senate and Assembly of the California Legislature, "[I]rrigation is necessarily and inseparably associated with reclamation.  It would be of comparatively little use to reclaim from overflow the swamplands of the Sacramento and San Joaquin Valleys, without providing at the same time an efficient system of canals and ditches for irrigating them during seasons of drought. . . . [N]o reclamation was perfect which does not include the means of irrigation."  (Cal. State Agricultural Society, Transactions of the State Agricultural Society During the Year 1872 (1873) p. 413, reprinted in 3 Appen. Sen. & Assem. J. (1874 Reg. Sess.))  Browne further acknowledged, "there's no antagonism between the two great schemes to which public attention is now invited -- reclamation and irrigation.  On the contrary, the success of one will materially benefit the other, and we have the most incontrovertible testimony that nothing adds so certainly and so largely to the wealth and population of a state as the two combined."  (*Ibid.*)

4

Whitney had great designs for furthering reclamation.  The Stockton Daily Independent blared, "Gigantic Enterprise."  A reporter accompanied Whitney on a voyage on the steamer Clara Crow and landed on Duck Slough near the center of the island.  He wrote, "Along the whole distance, some four miles, was lined with a continuous, busy stream of teams and men, pilling up the rich and alluvial soil into a levee of unusual strength and proportions, surpassing anything of the kind that has ever been constructed in the state. . . . [¶] . . . [¶] . . . It has been the aim of Mr. Whitney to employ the most improved mechanism in the prosecution of this work, and a test has been made of all the most recent innovations of that kind at present none in the state."  (*Gigantic Enterprise*, Stockton Daily Independent (Sept. 18, 1875) p. 1.)  He further reported that Whitney had constructed well-built houses and stables that would be used for farmhouses when the reclamation was completed.  As part of the reclamation of Roberts Island, he planned to dam Duck Slough.  A slough, according to Modesto Irrigation District's expert historian is a "stream of sorts" or a "low, swampy area that has some running water on it."

The reclamation paid large dividends as Roberts Island was transformed into rich and productive farmland.  The reclamation was big news and was very important to the California economy at the time.  On October 10, 1876, the San Francisco Bulletin featured an article about the fertility of the soil and the large range of crops that can be grown on Roberts Island.  "Along the banks of the San Joaquin River on Roberts Island some 20 settlers have been living for several years and built themselves up comfortable homes.  These people tell marvelous stories of the fertility of the soil, almost past belief, were they not corroborated by ocular demonstration of the growing crops.  One having a quarter-acre patch of blackberries sold.  He yield [*sic*] this last year $127.  Another with a few acres of [alfalfa] which he has cut eight times this year realized $150 per month from the butter that he sent to the San Francisco market.  Onions grow remarkable [*sic*] well, and three-acres leased to Chinese for all the net profits netted the owner of the land $499.

Where fruit trees have been planted the yield is immense, and the fruit is of excellent quality." (*Tule Reclamation*, S.F. Bulletin (Oct. 10, 1876).)

By December 1876 Whitney had decided to cash out his interests in the lower division of Roberts Island and in January 1877 he sold the upper division to Morton Fisher. Fisher approached reclamation with the same unbridled enthusiasm as his predecessors. His ambitions required financing and so he mortgaged his property to three British investors to obtain the cash to continue the reclamation work. Two years later, the San Francisco newspaper the Daily Alta California described the progress on Roberts Island as follows: "Roberts Island, which five years ago was almost wholly covered with a dense growth of tules, will this year produce several 100-thousands bushels of grains. . . . [¶] . . . Over 50,000 acres of highly productive land have thereby been rendered susceptible of profitable cultivation, and this year nearly 20,000 acres have been sown with wheat and barley most of which will produce a remunerative crop." (*Industrial Condition of the Slope*, Daily Alta California (June 2, 1879) p. 1.)

On October 31, 1881, Fisher entered into a crop mortgage with John Chaunce whereby Fisher allowed Chaunce to farm the land that would nine years later become the Robinson farm, and Chaunce agreed to share the profits from the crops that were planted and sold. Two years later, Fisher subdivided his vast holdings and began selling large lots.

By May of 1888 Fisher had exhausted all of his available cash and was unable to make his mortgage payments. The mortgage holders bought the property and then retained a real estate company to sell the property as fast as they could. The Stockton Daily Independent advertised the sale: "The island is situated only two miles from Stockton. The soil is as mellow as a cultivated garden, and often three crops have been raised from the same ground . . . and it is beyond question the best farming land in the state." *Roberts Island - A Chance to Secure Improved Tracts in the Upper Division*, Stockton Daily Independent (May 22, 1888) p. 3.)

The sales promotion was festive, but intense. The realtors ran excursions from San Francisco to the Delta and sponsored a grand reception, open air concert, and a barbeque. An auction was held under a huge tent. The Stockton Daily Independent announced that demand for choice farming lands was robust. (*Another Big Excursion*, Stockton Daily Independent (July 27, 1888) p. 3.) To promote sales to small farmers, they built warehouses on Roberts Island to store the crops until they could be loaded onto steamers bound for San Francisco. (*Warehouses on Roberts Island*, Stockton Daily Independent (June 9, 1888) p. 3.)

Isaac Robinson, Sr., purchased 108.02 acres of farmland in 1890. According to a biography included in A History of the New California: Its Resources and People, Robinson, Sr., "has here a valuable farm of one hundred and eight acres of good land under a high state of cultivation, and this has been his place of residence through consecutive years, his attention being given in an undivided manner to the further development and improvement of his farm. [He] bars [*sic*] a reputation as a progressive agriculturist, reliable in his business dealings and enterprising in his farm methods." He paid taxes on his farming utensils, horses, a cow, and chickens. (http://www.usgennet.org/usa/ca/state1/biographies/inrobinson.html [as of Apr. 6, 2020], archived at <https://perma.cc/QW77-ZU4M>.)

Irrigation remained an essential concern to the farmers. On March 25, 1898, the Stockton Daily Independent published an article entitled "Irrigating the Islands - Thousands of Acres of Green Will be Watered." The article explained: "[T]he floodgates have been opened and syphons are used to raise the water in some places. The water runs into laterals which cross the lands at regular intervals and have been used before heretofore as drainage ditches when there is a very wet season. . . . [¶] The soil is of a very peculiar kind and the water percolates it about twice the distance it would on the uplands. This enables the landowners to irrigate almost all of their properties from the ditches. The water runs in day and night and it will reach all parts of the island in time to

7

save most of the grain." (*Irrigating the Islands*, Stockton Daily Independent (Mar. 25, 1898) p. 7.)

## THE PRESENT DISPUTE

In 1925 Isaac Robinson, Jr., and several other landowners dug the Woods-Robinson-Vasquez (WRV) canal from near the levee on the north side of Middle River, along Inland Drive, and to the Robinson farm and other adjacent parcels. Robinson, Jr., died at the age of 105 in 2002. His granddaughter, appellant Tanaka, purchased the farm and continues to pump water out of Middle River through the WRV canal to irrigate her farm.

In 2011 respondent Modesto Irrigation District (MID) filed the instant action seeking declaratory and injunctive relief to enjoin Tanaka from diverting water from the Middle River. The case was tried before a judge. The trial court entered judgment in favor of MID declaring that Tanaka has no present right to continue diverting water to her farm from Middle River or from any other Delta watercourse and enjoined her from making such diversions. Tanaka appeals.

## DISCUSSION

### I

### *Standard of Review*

MID makes two fundamental mistakes: it urges us to employ the wrong standard of review and it relies on the wrong cases. Because the threshold issue requiring us to construe the terms of the grant deed is dispositive, we need not address the many other issues raised in the briefing. Construction of a written instrument triggers a simple and straightforward standard of review.

MID urges us to indulge all reasonable inferences in favor of the judgment, to imply findings to support it, and to find substantial evidence to support the judgment. In short, MID would have us apply a quite deferential standard of review. Although such

8

deference is required when the issues present factual disputes, the issue before us is a question of law and the appropriate review is de novo.

"The interpretation of a written instrument, even though it involves what might properly be called questions of fact [citation], is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect. [Citations.] Extrinsic evidence is 'admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible' [citations], and it is the instrument itself that must be given effect. [Citations.] It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence." (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.)

MID insists the extrinsic evidence was in conflict, and therefore, we should defer to the trial court's resolution of the factual disputes. We disagree. The credibility of the witnesses is not at issue. Our task " 'has been described as placing [ourselves] in the position of the contracting parties in order to ascertain their intent at the time of the grant.' " (*Schmidt v. Bank of America, N.A.* (2014) 223 Cal.App.4th 1489, 1500.) We must, therefore, place ourselves in 1890 in the shoes of Robinson, Sr., and the mortgage holders when they executed the grant deed to the farm. All of the percipient witnesses are presumably dead. Our construction of the language of the deed and of the circumstances leading up to the sale, therefore, does not turn on the credibility of any extrinsic evidence. Thus, it is solely a judicial function to construe the language in light of the surrounding circumstances to determine whether the parties to the sale intended that the farm would retain its riparian water rights.

## II

### *Construing the Express Language of the Deed*

The parties did not choose a bare boned deed whereby they could have merely identified the parties, described the property, and stated that the property was granted. (Civ. Code, § 1092.)  Instead the grant they chose was far more expansive.  The grant provided:  "Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging, or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof."  We must determine what this language would have meant to our 19th century friends.  We turn to the cases interpreting the language at the time it was used.

The use of the word "all" is both clear and important.  It signifies a desire to include everything.  It is broad and connotes a wide breath to the grant.  Tenements, hereditaments, and appurtenances are more archaic terms.  For these we must consult very old cases.  "The terms of a writing are presumed to have been used in their primary and general acceptation . . . ."  (Code Civ. Proc, § 1861.)  We agree with Tanaka that the "general acceptation" of the words "hereditaments" and "appurtenances" encompass riparian rights.

In the seminal case on riparian rights, *Lux v. Haggin* (1886) 69 Cal. 255, there are many references acknowledging that riparian rights were commonly considered to be hereditaments.  For example, the court wrote:  "In the learned opinions of Justices Ross and Myrick in [*St. Helena Water Co. v. Forbes* (1882) 62 Cal. 182], the right of the riparian proprietor to the use of the water is . . . 'an incorporeal hereditament appertaining to the land.' "  (*Lux v. Haggin*, at p. 300.)  The court similarly observed:  "The right to the use of water flowing over land is undoubtedly *identified with the realty*, and is a real and corporeal hereditament."  (*Id.* at p. 391.)  As if to emphasize the point, the court again stated:  "The supreme court of California has not been silent with respect to the

10

subject. [¶] 'The right to running water is defined to be a corporeal right or hereditament, which follows or is embraced by the ownership of the soil over which it naturally passes. [Citations.]' " (*Id.* at p. 392.)

Yet the concept was hardly a new one. Thirty years earlier, the Supreme Court had explained that "[t]he right to running water is defined to be a corporeal right, or hereditament, which follows or is embraced by the ownership of the soil over which it naturally passes." (*Hill v. Newman* (1855) 5 Cal. 445, 446.)

While it is true that riparian rights were more than an appurtenance, they nevertheless were commonly referred to as appurtenances. In the same year Robinson, Sr., bought his farm, the Supreme Court explained: "That they had some right in the flow, and to the use of said waters, as such riparian proprietors, is conceded on both sides. To the extent that it existed, it was an appurtenance to the land, running with it as a corporeal hereditament." (*Alta Land & Water Co. v. Hancock* (1890) 85 Cal. 219, 223.) Statutory law mirrored the Supreme Court's sentiment that riparian rights were appurtenant to the land. "A thing is deemed to be incidental or appurtenant to land when it is by right used with the land for its benefit, as in the case of a way, or watercourse, or of a passage for light, air, or heat from or across the land of another." (Civ. Code, § 662, enacted in 1872.)

The Black's Law Dictionary of 1891 (published under the name Dictionary of Law) supports the notion that the words "hereditaments" and "appurtenances" were commonly used to describe riparian rights at the time of the 1890 deed. Use of the phrase "all tenements, hereditaments and appurtenances" in a deed constituted "the widest expression for real property of all kinds" and included "everything of the nature of realty." (Black's Law Dict. (1st. ed. 1891) pp. 568-569.) The definition of each of the terms further supports Tanaka's argument that the parties would have understood the broad language of the deed to encompass riparian rights.

11

"TENEMENT. This term, in its vulgar acceptation, is only applied to houses and other buildings, but in its original, proper, and legal sense it signifies everything that may be *holden*, provided it be of a permanent nature, whether it be of a substantial and sensible, or of an unsubstantial, ideal, kind. . . . [¶] 'Tenement' is a word of greater extent than 'land,' including not *only* land, but rents, commons, and several other rights and interests issuing out of or concerning land." (Black's Law Dict. (1st ed. 1891) p. 1160.)

"HEREDITAMENTS. Things capable of being inherited, be it corporeal or incorporeal, real, personal, or mixed, and including not only lands and everything therein, but also heir-looms, and certain furniture which, by custom, may descend to the heir together with the land. . . . [¶] The two kinds of hereditaments are *corporeal*, which are tangible, (in fact, they mean the same things as land,) and *incorporeal*, which are not tangible, and are the rights and profits annexed to or issuing out of land. . . . [¶] The term includes a few rights unconnected with land, but it is generally used as the widest expression for real property of all kinds, and is therefore employed in conveyances after the words 'lands' and 'tenements,' to include everything of the nature of realty which they do not cover." (Black's Law Dict. (1st ed. 1891) pp. 568-569.)

"APPURTENANCE. That which belongs to something else; an adjunct; an appendage; something annexed to another thing more worthy as principal, and which passes as incident to it, as a right of way or other easement to land; an out-house, barn, garden, or orchard, to a house or message." (Black's Law Dict. (1st ed. 1891) p. 83.)

"APPURTENANT. Belonging to; accessory or incident to; adjunct, appended, or annexed to; answering to *accessorium* in the civil law. . . . [¶] A thing is deemed to be incidental or *appurtenant* to land when it is by right used with the land for its benefit, as in the case of a way, or water-course, or of a passage for light, air, or heat from or across the land of another." (Black's Law Dict. (1st ed. 1891) p. 83.)

All three words are expansive in their meaning. Hereditaments alone was generally used as the "widest expression for real property of all kinds" and, when coupled

12

with appurtenances and tenements, as well as the word "all" in front of all three terms, plus the additional language "belonging, or in anywise appertaining" to Robinson's farm, we agree with Tanaka it is abundantly clear that, in light of the "ordinary and popular sense" of those words and their "primary and general acceptation," the mortgage holders and Robinson, Sr., made it crystal clear that they intended to transfer "everything of the nature of realty" "belonging, or in anywise appertaining" to Robinson's farm, including riparian rights. (Civ. Code, § 1644; Code Civ. Proc., § 1861.)

## III

### *Considering the Extrinsic Evidence*

While the parties chose extraordinarily broad, inclusive language of conveyance, it is true they did not explicitly state that Robinson, Sr., would retain the riparian rights to the farm. For this reason, the deed was susceptible to the meaning MID urges; that is, that Robinson, Sr., was forever foregoing his right to divert water for his farm. The trial court admitted the extensive extrinsic evidence we recounted above and much more. We have culled the relevant evidence from the historical record developed at trial to ascertain whether the circumstances surrounding the sale suggest that the grantors' and grantee's intention was consistent with the inclusive language they used to express their intent to retain the riparian rights in the grant deed. We must consider the time and place of the sale, the interest of the grantee, a small farmer, and the interest of the grantors, the mortgage holders in a rush to dispose of hundreds of thousands of acres of reclaimed land.

**A Small Farm on Recently Reclaimed Land at the Height of an Agricultural Boom.** By the time Robinson, Sr., purchased his farm in 1890, an enormous amount of reclamation work had been completed on Roberts Island and a vast swampland had been transformed into the most productive agricultural land in the state. Media accounts boasted of the tremendous diversity of the crops and the boon the farms had become to

13

the state's economy.  Small farmers settled the island with aspirations of lucrative returns on their investments.  Irrigation systems were installed to great fanfare as a necessary corollary to the reclamation work.  And central to the success of the entire enterprise in the Delta was water.  Water was the lifeblood of the economy and the settlers faced the twin challenges nature presented—holding back the water to prevent massive flooding and saving the water and distributing it to farmers in times of drought.  At that moment in history, it is hard, if not impossible to imagine, that someone purchasing land on Roberts Island would not be concerned with their access to water.  That someone in our case is Isaac Robinson, Sr.

**The Grantee.**  Characterized as a progressive agriculturist, Robinson, Sr., bought approximately 108 acres to farm.  As the trial court queried, why would Robinson, Sr., a farmer, buy a farm without securing his right to water?  In short, he wouldn't.  He, like the other original settlers on Roberts Island, sought to make a living farming and, according to his biography, bought valuable, highly cultivated farmland.  To do so, he needed water.  There is absolutely no evidence he intended to give up his right to the very resource essential to sustaining and improving the farm he was purchasing.  To the contrary, the notion he intended to buy a landlocked parcel without access to water strains credulity.

**The Grantors.**  Nor is there any evidence the mortgage holders sought to cut off Robinson, Sr.'s, riparian rights.  These were men anxious to rid themselves of the thousands of acres they held as security, not to farm.  Their motivation, according to the record, was to divest as quickly as possible.  Their realtors employed state of the art advertising and marketing tools to interest small farmers in purchasing valuable farmland.  They even built warehouses for small farmers to store their crops.  The mortgage holders would not have benefited financially by cutting off a small farmer's riparian rights and, in fact, it would have undermined their ongoing marketing campaign to sell farmland to them.

**MID's Extrinsic Evidence.** MID directs our attention to scant evidence of what transpired years after the deed was executed. It points to evidence that there were a few years when the farm was not farmed, and that Robinson, Jr., recalled his father had told him there was no irrigation—just "rain from the heavens." MID emphasizes the farm was not contiguous to the river and, at the time of the purchase, there was not a ditch, canal, lateral, or pumping facility conveying surface water from Middle River to the farm through the levees.

In sum, there is absolutely no evidence that either Robinson, Sr., or the mortgage brokers who sold him his farm intended to cut off his riparian rights. The mere fact that Robinson, Sr., many years later stopped farming for unknown reasons has no bearing on his intent when he bought the farm. Nor does the fact that irrigation had yet to be built. The question is whether the parties intended the farm to have riparian rights into the future when it would no longer remain contiguous to the river and that right is not dependent on the availability of irrigation at the exact moment the grant deed was executed. It is not surprising that when Duck Slough was dammed in 1876, Whitney was more focused on drainage and drying out Roberts Island to prepare the land for cultivation than he was on irrigation. For after all, there had been massive flooding the previous winter forcing him to halt all of his reclamation efforts. We certainly do not think that a prior developer's plans during the height of reclamation supersede the intention of the grantors and grantee 14 years later when reclamation was complete and the business of agriculture was just beginning. Nor does the fact that the WRV canal was not built until 1925 change our analysis. The existence of a riparian right and the act of diversion are two separate matters. The existence of the right turns exclusively on the intention of the parties at the time of the execution of the grant deed and what did and did not transpire 35 years later is irrelevant to the dispositive issue before us.

The trial court appeared to recognize that no farmer in his right mind would intend to buy a farm without a right to water. Nevertheless, the court held that Tanaka retained

15

no riparian rights. The court did not base its decision on the intent of the parties at the time of the sale, however, but on cases decided long after the sale had been completed. We now examine how the court was led astray by cases that are factually inapposite and decided too late to have informed the parties' intent.

## IV

### *Misplaced Authority*

Ignoring the fact that *Murphy Slough, supra*, 27 Cal.App.3d 649 was decided 82 years after the sale of the farm and that *Phelps v. State Water Resources Control Bd.* (2007) 157 Cal.App.4th 89 (*Phelps*) was decided 117 years after the sale, MID believes these cases assure an affirmance. Needless to say, we disagree.

Taken out of its chronological and factual context, *Murphy Slough* is seductive. MID quotes language from the opinion that the unschooled reader might think is dispositive. The grant deed in *Murphy Slough* included the identical language found in Robinson, Sr.'s, 1890 deed. In both cases, the conveyance states: " '*Together with* all and singular, the tenements, hereditaments, and appurtenances thereunto belonging or in any wise appertaining and the reversion and reversions, remainder and remainders, rents, issues and profits thereof.' " (*Murphy Slough, supra*, 27 Cal.App.3d at p. 652.) Having quoted this language, the court in *Murphy Slough* observed that "it is patently silent as to riparian rights." (*Id.* at p. 655.) The court thereafter concluded, based on the unique circumstances disclosed by the extrinsic evidence, that the grantors severed the riparian rights to the 100-foot strip of land conveyed to a reclamation district. The result, far from supporting MID's position, undermines it for several reasons.

The extrinsic evidence supported the court's finding that the grantors intended to retain their right to riparian rights and to sever those rights from the strip of land conveyed to the reclamation district. In *Murphy Slough*, the grantee was a reclamation district formed to construct and maintain existing levees contiguous to the river and

16

slough. The court emphasized "that the overriding principle in determining the consequence of a conveyance of land insofar as riparian rights are concerned is the intention of the parties." (*Murphy Slough, supra*, 27 Cal.App.3d at p. 657.) The court concluded, "[A]t no time was there evidence of an expressed or implied intention to acquire a fee ownership of riparian rights or to administer or furnish water to the grantor landowners." (*Ibid.*) Rather the parties intended for the reclamation district to acquire only a right-of-way for reclamation purposes while the landowner grantors retained riparian rights to the land south of the levee. (*Id*. at p. 658.) The court was straight forward in its assessment of the extrinsic evidence: "[I]t would be absurd to conclude that riparian rights to the 100-foot strip were conveyed to the grantee, a reclamation district which had no power or authority to administer water rights for the benefit of its members." (*Id.* at p. 656.)

The extrinsic evidence of the parties' intent in the case before us points in the opposite direction. Whereas the grantee in *Murphy Sough* was a reclamation district with no interest in securing a right to water, Robinson, Sr., was a farmer whose very livelihood depended on it. Nor does a 108-acre working farm compare to a 100-foot strip of land the reclamation district obtained to construct and maintain levees. And whereas there was compelling evidence that the grantor landowners in *Murphy Slough* had retained their riparian rights and only granted the reclamation district a right-of-way, there is no evidence that the mortgage holders, who were anxious to sell their vast holdings to farmers, intended to sever any farmers' riparian rights.

As a consequence, *Murphy Slough* stands for the unremarkable legal proposition that the intention of the parties governs the consequence of a conveyance of land insofar as riparian rights are concerned. In the face of overwhelming and compelling extrinsic evidence that neither the grantor landowners or the grantee reclamation district intended to convey riparian rights, the court minimized the significance of the language of the

17

deed. Thus, the evidence of the parties' intent trumped the literal language of the deed in a case in which the two were in conflict.

Here the extrinsic evidence is consistent with the express language of the deed. Both reflect a clear intention that the farmer retain his riparian rights. There is nothing in *Murphy Slough* to compel a different outcome.

MID also misconstrues *Phelps, supra*, 157 Cal.App.4th 89, the case it highlights in the first sentence of its reply. Ominously, MID writes that "where the owner of a riparian tract conveys away a noncontiguous portion of the tract by a deed that is silent as to riparian rights, the conveyed parcel is forever deprived of its riparian status." Again we must point out the obvious fact that the case was decided more than a century after the Robinson, Sr., deed was executed and, therefore, has no bearing on the meaning of the words used in the conveyance or the intention of the parties in executing the grant deed. Moreover, the facts of the case bear no resemblance to the facts before us and the case does nothing to upset the well-grounded principle of law that the intention of the parties is paramount in determining whether riparian rights have been retained or severed.

The most glaring distinction between *Phelps* and the case before us is the lawyer's concession that the language of the deed used in *Phelps* did not retain riparian rights. As a result, the issue was not the meaning of the grant of conveyance but only whether the parties intended to retain the riparian rights. On that point, unlike in our case, the evidence was in conflict and a factual dispute emerged. There was a battle of the experts each opining a contrary intent from maps, photographs, and drawings. The trial court gave detailed reasons for rejecting the plaintiff's evidence. This court held that ["w]here evidence is in conflict, we must resolve the conflict in favor of the trial court's finding." (*Phelps, supra*, 157 Cal.App.4th at p. 118.)

At trial in the case before us, both sides offered dueling historical evidence. But there was no conflict in the evidence relevant to the intent of the parties at the time the grant deed was executed. There was a considerable amount of conflicting trial testimony

18

about where Duck Slough was located over time.  But we need not reach the issues involving Duck Slough.  Because *Phelps* established no new legal concepts and merely applied a deferential standard of review to a disputed issue of fact, it bears little significance to the question of contract interpretation before us.

There are several other cases reinforcing the important point that riparian rights may be severed to a noncontiguous piece of land where a grant deed is silent or the parties' intentions can be ascertained.  MID cites us to these cases.  (*Rancho Santa Margarita v. Vail* (1938) 11 Cal.2d 501; *Hudson v. Dailey* (1909) 156 Cal. 617; *Anaheim Union Water Co. v. Fuller* (1907) 150 Cal. 327.)  We are mindful of the somewhat precarious nature of riparian rights of land that is no longer contiguous to a watercourse.  But the cases universally echo the same basic principle that the intention of the parties govern.  We have examined both the express language of the contract as well as the extensive extrinsic evidence from which we can infer the parties' intent.  None of the cases MID cites undermines our confidence that Robinson, Sr., and the mortgage holders intended that the farm would retain its riparian rights even when it no longer remained contiguous to Middle River.

## DISPOSITION

For all the reasons discussed herein, the judgment is reversed.  Tanaka shall recover costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

/s/

RAYE, P. J.

We concur:

/s/

HULL, J.

/s/

ROBIE, J.

19